1          UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____
                                    )
4    UNITED STATES OF AMERICA,      ) CR20-00215-RSM
                                    )
5                  Plaintiff,       ) SEATTLE, WASHINGTON
                                    )
6    v.                             ) September 8, 2021 -
                                    ) 9:00 A.M.
7    ELLEN BRENNAN REICHE,          )
                                    )
8                  Defendant.       ) JURY TRIAL - DAY 2
                                    )
9    _____)

10   _____

11           VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE RICARDO S. MARTINEZ
12           UNITED STATES DISTRICT JUDGE
     _____

13

14   APPEARANCES:

15   For the Plaintiff:      Philip Kopczynski
                             Sok Tea Jiang
16                           U.S. Attorney's Office
                             700 Stewart Street, Suite 5220
17                           Seattle, WA  98101

18   For the Defendant:      Jesse G. Cantor
                             Christopher Sanders
19                           Federal Public Defender's Office
                             1601 5th Avenue. Suite 700
20                           Westlake Center Office Tower
                             Seattle, WA

21

22

23

24

25

**Proceedings stenographically reported and transcript produced with computer-aided technology**

```
1                        EXAMINATION INDEX

2

3    EXAMINATION OF                                       PAGE

4    ERIC SHAFFSTALL      CROSS-EXAMINATION              126
                          BY MR. SANDERS
5                         REDIRECT EXAMINATION           149
                          BY MR. KOPCZYNSKI
6                         RECROSS-EXAMINATION            152
                          BY MR. SANDERS
7    DANE CHAMBERS        DIRECT EXAMINATION             153
                          BY MR. KOPCZYNSKI
8                         CROSS-EXAMINATION              177
                          BY MR. CANTOR
9                         REDIRECT EXAMINATION           186
                          BY MR. KOPCZYNSKI
10   STANLEY A.           DIRECT EXAMINATION             189
     STREUBEL             BY MS. JIANG
11                        CROSS-EXAMINATION              199
                          BY MR. CANTOR
12

13

14
                          EXHIBIT INDEX
15

16   EXHIBITS ADMITTED                                   PAGE

17    Exhibit Nos. A-1 - A-12                            177

18

19

20

21

22

23

24

25
```

 1          (The following occurred outside the presence of the jury.)

 2          THE COURT:  Good morning.  Please be seated.

 3      Counsel, good morning and welcome back.  Our jurors are all

 4  here and ready to go.

 5      I know we need to take care of some of these logistical

 6  issues.  In fact, the one I want to deal with is the instruction

 7  issue.

 8      So, Mr. Cantor, did you have time to look at the proposed

 9  instruction that the government wants to add?

10          MR. CANTOR:  Yes, I did, Your Honor.  And I'm going to

11  oppose that instruction.

12      After reading the commentary, it appears that this

13  instruction is really only appropriate if the jury learns that

14  Samantha brooks is, in fact, a co-defendant, and had she been

15  tried as a co-defendant and then removed during the trial, or at

16  some point after the jury learns that she's a co-defendant,

17  whether she pleads guilty or maybe there's a judgment of

18  acquittal pertaining to a co-defendant, that's when this

19  particular instruction applies.  That's how I read the

20  commentary.

21      So at this point the jury does not know anything about

22  Samantha Brooks other than that she was, you know, there with my

23  client, that they were walking together.  There has been no

24  testimony that charges were ever brought against her, that the

25  case was ever brought against her.  And based on that, I see no

1  reason to include this instruction, and I think it can even

2  confuse the jury as well if they're given this instruction

3  because then it assumes that she's a co-defendant when there's no

4  evidence or testimony or even instruction that she was ever even

5  charged in this case.

6         THE COURT:  All right.  I agree with you, counsel, at

7  this point in time.

8     If that testimony does come in, do you have any problem with

9  the language, the wording?

10        MR. CANTOR:  I have no problem with the instruction,

11 yeah, if it becomes an issue.  I don't think it should become an

12 issue.

13        THE COURT:  And given the fact, counsel, that we could

14 actually have the government rest at some point today, are there

15 any other instructional issues from the defense?

16        MR. CANTOR:  We did propose a mere-presence instruction.

17 Other than that, we are in agreement with the government's

18 instruction.

19    The verdict form, I suggested that we tweak the verdict form

20 to include a yes-or-no response to the special questions, the

21 special interrogatories about attempt, conspiracy.  I believe the

22 government was in agreement with that, but the Special Verdict

23 Form that's been presented does not have the yes-or-no boxes to

24 be checked.  And that's the only other suggestion that I have.

25 Other than that, we are in agreement with the instructions.

1    THE COURT:  Thank you.

2    Mr. Kopczynski, obviously, what I want to do is be ready, and

3  I don't want to be delayed, especially once we finish all the

4  testimony, and be able to go right into the instructional phase

5  with the jurors, so I'm trying to get that prepared as soon as we

6  can.

7    Do you agree with the changes proposed by Mr. Cantor in the

8  verdict form?

9    MR. KOPCZYNSKI:  Yes, as to the verdict form,

10 absolutely, no issue with that idea of instead of a checkbox, I

11 guess, or a yes/no, we have no issue with that.

12   We do oppose "mere presence" only because I think it's right

13 there in the commentary that mere presence is just typically not

14 necessary to give that instruction.  That idea is implicit in the

15 instructions on the elements of the crime.  If a person

16 doesn't -- you know, if the evidence doesn't satisfy the

17 elements, then the person is not guilty, and "mere presence"

18 doesn't add anything to that instruction.  So we oppose it on

19 that basis.  It just doesn't seem necessary.

20   THE COURT:  All right.  Thank you, counsel.  That helps

21 me a lot in getting the instructions ready.

22   We will give you, definitely, an opportunity to formally

23 oppose any instructions on the record once you see the Court's

24 proposed instruction, all right, and take any exceptions to

25 anything that you think is not appropriate.

 1        All right.  Are we ready for our jurors?

 2            MR. KOPCZYNSKI:  So, Your Honor, if I may?

 3        One other issue that I think will come up this morning in

 4    testimony that actually relates somewhat to what we were just

 5    talking about.  So the defense informed us that they planned to

 6    call, or at least may call, the government's case agent, Levy

 7    Kauffman.  Now, I don't know what that is for, but I can have a

 8    guess, and that's based on the statements in opening by the

 9    defense about sort of putting the government's investigation on

10    trial and the fact that the government elected not to pursue

11    various forensic testing of those items in the bag.  So if that

12    is, in fact, what the defense wants to elicit from the

13    government's case agent, I think that puts the government in a

14    real dilemma because the fact is that an important reason why the

15    government never tested those items, in addition to the fact that

16    there's this COVID-related backlog at Quantico, is that the

17    co-defendant, Brooks, pleaded guilty.  As Mr. Cantor just said,

18    that fact is not presently before the jury, but here is the

19    reality that is facing the government.  This defendant, who is

20    here in court today, was holding that bag, so it's pretty

21    questionable what added value fingerprints would do.  She's

22    physically in possession of the bag.  The co-defendant, Brooks,

23    maybe could have plausibly claimed that she didn't know what was

24    in the bag.  So as to Brooks, if Brooks was on trial, maybe the

25    government would have tried to push those items to the front of

1    the line, test those items, but Brooks pleaded guilty months ago

2    and is set to be sentenced by Your Honor.

3        So, as I say, I think if that is, in fact, the defense's

4    intentions for Mr. Kauffman -- and based on their opening

5    statement, it seems like it -- the government is in a real bind.

6    And I propose that, on cross of Agent Kauffman, we're permitted

7    to elicit the fact that Brooks accepted responsibility and

8    pleaded guilty.

9        THE COURT:  I don't know what the defense is going to

10   do.  They may find themselves in a dilemma because the Court

11   might just allow the government to be able to respond to that,

12   that that is a valid reason why you didn't do that.

13       If they choose to call this witness and go into that

14   particular area of questioning, then this might very well be

15   opening the door, yes.

16       MR. KOPCZYNSKI:  Okay.  Thank you, Your Honor.

17       MR. CANTOR:  Your Honor, may I respond to that?

18       THE COURT:  Sure.

19       MR. CANTOR:  May I respond?  Because I think this is

20   something that has to be sorted out.

21       What counsel is not mentioning is that there is no and has

22   been no and nor will there be any testimony that Ms. Brooks or

23   Ms. -- Sam Brooks or Ms. Reiche handled the contents of the bag.

24   It's totally different.  Holding the handle of a paper bag is a

25   totally different situation than actually handling the drill or

1   wearing the gloves or handling the wire inside.  So the idea of

2   sending those contents, including what was recovered from the

3   scene, to the FBI Lab for testing two days after the arrests nine

4   months ago, it presents a -- it doesn't put the government in a

5   bind because they were fully aware that happened.  If they're

6   saying now it opens the door to presenting testimony that Sam

7   Brooks has pled guilty simply because Ms. Reiche was holding the

8   handles of the bag, there's really no connection there because,

9   again, there's no testimony, nor there will be any testimony,

10  that anyone handled the contents of the bag.  And that's really

11  at issue.  What is the status of the contents of the bag?  What

12  were the laboratory results of the contents of the bag that were

13  sent to the lab?  The bag itself wasn't sent to the lab.  It was

14  the contents.

15       So if the Court is going to allow -- if the Court is going to

16  allow the government to then get into -- or have the agents

17  testify that Ms. Brooks pled guilty, I think the Court should

18  make a ruling in limine on that now before we make that decision.

19  But this is my proffer.  This is why we are going to call Agent

20  Kauffman.  And that's consistent with what was said in the

21  opening statements.

22       We're going to be able to -- I think we even got out, with

23  Tyler Nies, that this evidence was sent over or turned over to

24  the FBI.  The FBI took possession of it, and they did that for a

25  reason.

1        The discovery and Kauffman's report and what we have from the

2    government shows that two days after this evidence was turned

3    over, specifically the contents of the bag, was turned over to

4    the FBI, the FBI took action by sending everything to their crime

5    lab, and there are no forensic reports or conclusions about who

6    handled those items.

7        And to say that we're now opening the door to Brook's change

8    of plea simply because Ms. Reiche was holding the actual bag,

9    although there's no testimony about her handling the contents of

10   the bag, I think that there's no connection there, that that does

11   not open the door.  The simple fact that the items were not --

12   that the items were sent to the lab and we have no result of

13   that, I think that's appropriate examination that does not open

14   the door to Brooks' change of plea, because they are just too

15   attenuated from one another.

16       So I would ask the Court to make a ruling on that before we

17   make the final decision about calling Agent Kauffman.

18            THE COURT:  Mr. Cantor, a trial is supposed to be a

19   search for the truth.

20            MR. CANTOR:  Yes.

21            THE COURT:  And that means that both sides, within the

22   rules, get to put on the testimony that allows the jurors to

23   search for the truth.

24       In this particular case, there were steps taken by both sides

25   or things that were done and why they were done by the

1  government, specifically dealing with the evidence in the bag,

2  that had to do with the fact that the co-defendant did plead

3  guilty.

4      Right now, both you and the government are quite aware of

5  what evidence is.  As I told the jurors during the instructional

6  phase yesterday, it's the sworn testimony of any witness, the

7  exhibits received, and anything to which both parties agree.

8      Right now, you don't need any additional testimony to be able

9  to argue to the jury that they have no -- there was no

10  fingerprint evidence, there was no forensic stuff done, and the

11  government had every ability to do that.  Why they chose to do

12  that or chose not to do that is up to them.  That part won't come

13  in.

14      The fact that you're able to argue your theory of the case is

15  still right there.  You don't need to call this witness.  If you

16  do call the witness, however, then, at that point in time, you

17  may very well be opening the door to having the government

18  explain why they didn't ask for it to be tested.

19      MR. CANTOR:  Very well.

20      Can I also clarify then, if we do decide to call Agent

21  Kauffman, that the extent of this inquiry as to why the contents

22  were not tested is limited to Samantha Brooks changing the plea

23  to guilty and not getting into the proffer?  So if it's just

24  limited to, "Well, Samantha Brooks changed the plea to guilty,"

25  that's one thing, but if the government's intent is then to get

1  into maybe the proffer of Samantha Brooks, who is not going to be

2  a witness to testify and answer questions about that proffer, I

3  would like to know, again, if the government is going to do that

4  before we make this decision about whether we're going to call

5  Agent Kauffman.

6      So if it's just limited to the change of plea, that Samantha

7  Brooks pled guilty, and because she pled guilty we decided not to

8  do forensic testing, that's one thing, but if it goes beyond

9  that, with additional testimony about statements Samantha Brooks

10  may or may not have said, where we cannot examine Samantha

11  Brooks, I would like to know that in advance, in the form of a

12  ruling in limine about whether that would even be admissible

13  before we make this decision to call Agent Kauffman.

14      THE COURT:  All right.

15      Mr. Kopczynski, I have no idea whether you intend to get into

16  anything in terms of the potential proffer that may have been

17  made by Ms. Brooks.

18      MR. KOPCZYNSKI:  We would agree not to.  I mean, look,

19  the reality is that is another factor.  You know, all of these

20  things are in the mix for us as we make decisions about something

21  like forensics.  And the fact has been disclosed to Mr. Cantor in

22  discovery, Brooks made proffer statements implicating the

23  defendant in connection with pleading guilty.  So those are true

24  facts.  But, no, I understand Mr. Cantor's concern.  That, we can

25  just leave out of the jury's view.

 1           THE COURT:  All right.  I agree.  I think that's very

 2    far afield and would get into much more difficult evidentiary

 3    type issues and rulings at that point.

 4       So, Mr. Cantor, if you choose to call the FBI agent as a

 5    witness and you limit your questioning as we've discussed this

 6    morning, then I think the government would be limited simply to

 7    eliciting the fact that Ms. Brooks entered a plea of guilty,

 8    which was the reason they decided not to send the items out for

 9    forensics since it was your client who was holding the bag, so to

10    speak.  All right?

11           MR. CANTOR:  Yes.

12           THE COURT:  Madam Clerk, we have kept our jurors waiting

13    too long.  Please bring them in.

14           THE CLERK:  Mr. Shaffstall.  And we need

15    Mr.  Shaffstall.  Where is he?  Where is our witness?

16           MR. KOPCZYNSKI:  He's right outside.  Thank you.

17           THE COURT:  Good morning, sir.  You remain under oath.

18    We're waiting for our jurors to come in.  Go ahead and take the

19    stand.

20           THE WITNESS:  Thank you, sir.

21           THE COURT:  All rise for our jury.

22       (The following occurred in the presence of the jury.)

23           THE COURT:  And thank you.  Good morning.  You may all

24    be seated.

25       Welcome back, ladies and gentlemen.  I hope your commute in

1   wasn't too bad today, even though I think really pandemic traffic

2   is almost back up to where it was prepandemic.  So it's getting

3   tougher for every single one of us who has got to commute in

4   here.

5       Thank you for your patience.  We kept you waiting for a

6   little bit longer than we wanted to, but I hope you realize that

7   we're not just wasting our time up here; we're trying to

8   logistically move things along to hopefully make everything a

9   little bit smoother.

10       If you remember where we were yesterday when we broke for the

11  evening, Mr. Shaffstall had just finished his direct testimony

12  with the government, and now we move to cross-examination by

13  Mr. Sanders.

14                      ERIC SHAFFSTALL,

15       previously sworn, resumed and testified as follows:

16                      CROSS-EXAMINATION

17  BY MR. SANDERS:

18  Q   Good morning.

19  A   Good morning.

20  Q   So let's just take a few moments just to sort of resituate

21  ourselves.  You testified yesterday a little bit about your

22  career, right?

23  A   Yes.

24  Q   You told us that you had been working with BNSF for 24 years?

25  A   Yes.

1   Q   Since 1996?

2   A   Yes.

3   Q   You worked in different locations, right?

4   A   Yes.

5   Q   You did a stint in Seattle, correct?

6   A   Yeah.

7   Q   A stint in Tacoma?

8   A   Correct.

9   Q   In Kansas even?

10  A   Yes.

11  Q   Wenatchee at a point too?

12  A   Yes.

13  Q   Now you are in Bellingham; is that right?

14  A   My headquarters is in Everett.  My territory goes through

15  Bellingham.

16  Q   Got it.

17      The point is, you have been doing this a while, right?

18  A   Yes.

19  Q   You're familiar with the principles of electricity, as you

20  told us?

21  A   Yes.

22  Q   All right.  You also told us that your job is what's called a

23  design engineer; is that right?

24  A   A previous job.  My current job is supervisor.

25  Q   Got it.

 1        You used the term "pencil engineer," even, right?

 2   A    Yes.

 3   Q    Okay.  Part of this job -- you know, that's not to be

 4   confused with a railroad engineer, right?

 5   A    That's correct.

 6   Q    Meaning you're not the person navigating the rails from the

 7   engine?

 8   A    That is correct.

 9   Q    Your job, your previous job at least -- and now you are a

10   supervisor -- your job was to plan or design this railroad signal

11   system, right?

12   A    Almost.  I was the quality assurance engineer.  Somebody else

13   did the design.

14   Q    Sure.

15   A    I checked and verified their design.

16   Q    Got it.

17        But the point is, you weren't navigating the system from the

18   actual rails?

19   A    That is true.

20   Q    Okay.  And as this pencil engineer, you told us that it is

21   your job to focus on efficiency without compromising safety; is

22   that right?

23   A    Yes.

24   Q    So, of course, safety matters too, right?

25   A    Yes.

1  Q   We all care about safety of the rails, correct, but let's

2  take a moment just to talk about this idea of efficiency at least

3  as it relates to your job.

4      Let's backtrack a little bit.  You work for BNSF; is that

5  right?

6  A   That is correct.

7  Q   They're your employer?

8  A   Yes.

9  Q   Okay.  And that stands for Burlington Northern Santa Fe Rail?

10  A   Yes.

11  Q   Which is a business, it's a corporation?

12  A   Yeah.

13  Q   And like any other business, the purpose of BNSF is to make

14  money through the business, correct?

15  A   Sure.

16  Q   And BNSF's business is this rail system, right?

17  A   Yes.

18  Q   This rail system moves goods, right?

19  A   Yeah.

20  Q   Goods of all kinds, right?

21  A   Yeah.

22  Q   For example, the rail system, BNSF rail's system moves lumber

23  perhaps?

24  A   I would assume.

25  Q   Or coal?

 1   A   Yes.  Yeah.

 2   Q   Or even oil, right?

 3   A   Yeah.

 4   Q   Okay.  And this system, the BNSF rail system, exists in many

 5   states, right?

 6   A   Correct.

 7   Q   Okay.  So when you talk about efficiency of the BNSF rail

 8   system, you are talking about the movement of these trains

 9   through this network, right?

10   A   Correct.

11   Q   The movement of those goods through that network?

12   A   Yes.

13   Q   Okay.  And so it's your job to make sure that that happens

14   with safety in mind?

15   A   Yes.

16   Q   Okay.  So any disruptions to the BNSF network -- Let me

17   rephrase.

18       Let's talk about disruptions for a little while.  Yesterday

19   you talked about shunts, right?

20   A   Correct.

21   Q   And you spoke about how shunts are perhaps maybe just wires,

22   right?

23   A   Yes.

24   Q   They're wires that connect one rail to another, correct?

25   A   Correct.

1   Q    Shunts are anything that can conduct electricity from one

2   rail to another?

3   A    That's correct.

4   Q    That's a shunt?

5   A    Yes.

6   Q    And, in fact, you use shunts in your everyday business,

7   right?

8   A    Yes.  My employees do.

9   Q    Right, your employees do, because you are a supervisor.

10  A    Exactly.

11  Q    In your previous job you might have used them; is that right?

12  A    That is correct.

13  Q    Okay.  So you are familiar with the concept of how this

14  works?

15  A    Yes.

16  Q    And it's just a fairly simple device; it's a wire, perhaps,

17  that connects one rail to the other, right?

18  A    That's correct.

19  Q    And the wire has to be affixed on each rail, right, in some

20  sort of way?

21  A    It has to make good contact with it, yes.

22  Q    And by having good contact, sometimes it's helpful to have

23  something that affixes the wire to the rail?

24  A    Yes.  That's one way, yeah.

25  Q    Okay.  You also talked about how a shunt could be the rail

1    car itself, right?

2    A    Yes.  They're designed to shunt the rail.

3    Q    Correct.

4         So they work in the same way, meaning, I think you said, the

5    wheels and axel of the train car act as a shunt effectively; is

6    that correct?

7    A    That's correct.

8    Q    And even if the shunt is not a real train, no matter what,

9    that shows that -- or when there is a shunt, that shows that that

10   particular block of rail is occupied; is that right?

11   A    That's correct.

12   Q    Okay.  And, again, as a pencil engineer, at least in your

13   previous job, and now as the supervisor, it's your job to make

14   sure this system is sort of flowing in an uninterrupted way,

15   right?

16   A    I don't think I followed your question.

17   Q    Well, let me backtrack a little bit because I want to get

18   into sort of this idea of shunts and how they cause rail blocks

19   to be occupied or unoccupied.

20   A    Okay.

21   Q    You talked a little bit about that yesterday; is that right?

22   A    Yes.

23   Q    You actually drew a chart for us to sort of help us

24   understand.

25        Let's, if we could, pull up Defense Exhibit A-16, but do not

1  publish that to the jury.  It has not been admitted.  I think we

2  need to turn the defense system on.

3     Okay.  So I will give you a moment just to examine this.

4  Just look up at me once you have had a chance to look it over.

5  A   Okay.  I see this.

6  Q   Okay.  So, yesterday -- Well, let me ask you first about this

7  exhibit.  Does this look familiar to you?

8  A   Yes, it does.

9  Q   And would you say, in general, that this is an accurate

10 depiction of how trains' circuits work and how a train circuit

11 might be occupied or unoccupied?

12 A   Yes, I'd agree with that.

13 Q   Okay.  And I would like to publish this to the jury.  We're

14 not asking it to be admitted, but this is simply for

15 demonstrative purposes as we talk about this issue.

16        THE COURT:  Any objection by the government as a

17 demonstrative exhibit?

18        MR. KOPCZYNSKI:  No, Your Honor.

19        THE COURT:  Ladies and gentlemen, what that means is all

20 exhibits that are admitted, fully admitted, go back to the jury

21 room for deliberation purposes for you to look at to your heart's

22 content.

23     A demonstrative exhibit is exactly that.  It's just

24 demonstrative.  It demonstrates something.  So that would not go

25 back with you.  So it's only to be used here in the courtroom.

 1        You may publish, counsel.

 2             MR. SANDERS:  Okay.  Thank you.

 3   Q   So now that this exhibit has been published, can you tell us,

 4   on the left side of the chart, where it says "A, unoccupied,"

 5   what is that left side?

 6   A   In this particular block system, they're using a DC battery

 7   at one end of the track circuit and a relay at the other end of

 8   the track circuit, and so long as the track circuit is

 9   unoccupied, the relay will remain energized.

10   Q   Got it.

11        So when the track circuit is energized, does that mean that

12   there's electricity flowing around the circuit?

13   A   Yes, it does.

14   Q   You talked a little bit about that yesterday, right?

15   A   Yes.

16   Q   You mentioned that there's a very low voltage of electricity

17   running along that circuit?

18   A   That's correct.

19   Q   I think you said less than a nine-volt battery?

20   A   Quite a bit less, yes.

21   Q   And your systems would detect that low-voltage electricity?

22   A   That's correct.

23   Q   Meaning this kind of relay, that's the detection system?

24   A   It is, yes.

25   Q   And as long as that electricity is flowing around that

1    circuit, then that relay will show as energized?

2    A    It will show that the track circuit is unoccupied.

3    Q    Right.

4         So if it's energized, then it shows as unoccupied?

5    A    Correct.

6    Q    Now, let's move then to the right side of the chart.  Does

7    this, in general, show an occupied track circuit?

8    A    Yes, it does.

9    Q    And when the track circuit -- or the circuit's block is

10   occupied, that means that the energy or the electricity running

11   around the circuit is not flowing to the relay; is that correct?

12   A    That is correct.

13   Q    And when that happens, that relay is de-energized?

14   A    Correct.

15   Q    And when the relay is de-energized, that means that the track

16   block, or at least that particular block, shows as occupied?

17   A    That's correct.

18   Q    Okay.  And as you already stated a little bit ago, there are

19   a couple of things that could cause a circuit block to show as

20   occupied, right?

21   A    Yes.

22   Q    Meaning the train axles -- the wheels and the axle act as a

23   shunt, and that by itself -- I mean, this is the way it's

24   designed -- is to shunt the rails and cause that relay to

25   indicate as occupied?

1    A    Correct.

2    Q    Got it.

3         Likewise, if there is a wire perhaps running across the

4    tracks, that would also de-energize that relay system and make it

5    show as occupied?

6    A    Correct.

7    Q    Or, as you mentioned, when your employees test these rails,

8    that could also make the system show as occupied?

9    A    Correct.

10   Q    Okay.  You also talked about how -- Yesterday, you mentioned

11   how there's no way to tell from the system, at least, like if you

12   were just looking at the system from afar, what is causing a

13   particular rail block to be occupied, right?

14   A    Correct.

15   Q    Meaning you actually have to go to the location and maybe do

16   some testing to troubleshoot, right?

17   A    Yes.

18   Q    You just know, at least from the systems, from the

19   perspective of just looking at the system, that if a circuit

20   block is occupied, it's occupied, but you don't know why,

21   necessarily?

22   A    Perhaps.  I mean, we track trains across the system.  So if

23   we have been tracking a train into that block and the block is

24   occupied, we know the train is in that block.  So then we do know

25   why.

 1   Q   Sure, sure.

 2       So you would know if there's a train there because you would

 3   have been tracking the train along the tracks, right?

 4   A   Correct.

 5   Q   But there was no train in this particular incident?

 6   A   That's correct.

 7       One that just comes in unexpectedly --

 8   Q   Correct.

 9   A   -- we have no prior knowledge of what's creating that block

10   occupancy.

11   Q   Got it.

12       Let's go back to this exhibit for just a moment.  It would

13   appear that there are some pretty important elements to how this

14   system works.  For example, this relay component, that's pretty

15   important, right?

16   A   Oh, yes.

17   Q   Because that's what tells us if that circuit block is

18   occupied or unoccupied, right?

19   A   Correct.

20   Q   Meaning if it's de-energized, then it's occupied?

21   A   Correct.

22   Q   Wouldn't that mean, then, that if there was a problem with

23   the relay, that that might cause the circuit system to show as

24   unoccupied -- or, I'm sorry, as occupied?

25   A   Yes.

1  Q    Okay.  There are some other important components of this

2  system.  For example, the power source.  That power source is

3  necessary to send that electricity around the circuit; is that

4  right?

5  A    That's correct.

6  Q    Meaning this system does not work if that power source is not

7  working?

8  A    That's correct.

9  Q    And if there is a problem with that power source and if it is

10  necessary, doesn't that also mean that a problem with the power

11  source could cause that circuit block to appear as occupied?

12  A    It could.

13  Q    Okay.  And, of course, as you've testified, when you are

14  looking at the system and you see a circuit block appear as

15  occupied, you don't know what the issue may be, right?

16  A    That's correct.

17  Q    I mean, you told us that you would know if it were a train

18  because you had been tracking the train?

19  A    Right.

20  Q    But you wouldn't know beyond that what may cause a circuit

21  block to appear as occupied?

22  A    Correct.

23  Q    Okay.

24  A    Correct with some limitations.

25       The system we're using is much more sophisticated than the

1    one depicted here.

2    Q    Sure.

3    A    This is a very simplified version of it.

4    Q    Absolutely.

5    A    Rather than a battery at one end and a relay at the other

6    end, there's a computer at both ends talking to each other,

7    simulating the function of a battery and relay.  If that computer

8    had a problem, it reports that; it has radio communication with

9    our dispatch center.

10        So it's not the same as to say if the source end were to

11   fail, we wouldn't know until we got there.  If the source end

12   failed, it would indicate to our dispatch office a failure so

13   that we can rapidly repair it.

14   Q    Got it.

15   A    So what you said is correct on the surface, but there's much

16   more detail to it than that.

17   Q    Okay.  I want to take a moment to also talk about the -- We

18   have talked about circuit blocks as they work on a really

19   specific and minute level, but I want to talk about sort of the

20   general railroad signal system.

21   A    Yeah.

22   Q    So when you string these circuit blocks together, as you

23   talked about in your chart yesterday, that's the railroad signal

24   system, in a nutshell?

25   A    Correct.

1  Q    And that system tells us -- I mean, that's how you track

2  trains, right?

3  A    Yes.

4  Q    By seeing over a string of railroad blocks, you would see a

5  string -- you might see a sequential string of circuit blocks

6  indicate as occupied and maybe that shows a train moving across

7  the tracks?

8  A    That is exactly how we do it.

9  Q    Okay.  And when a disruption to that signal system happens,

10 that has the effect of perhaps delaying any train that may be

11 coming through, right?

12 A    Yes, it could.

13 Q    And, for example, a disruption to an individual circuit block

14 could cause a disruption to a train that is passing over that

15 circuit block ten minutes later or an hour or 30 minutes later,

16 right?

17 A    If I understand you correctly, you're saying a disruption in

18 the block out in advance of the train would slow down the train

19 before they got to it; is that your question?

20 Q    Yes.

21 A    Yes, that's true.

22 Q    Okay.  Those kind of disruptions can also cause crossing-arm

23 failures; is that right?

24 A    Yes.  Well, it's not a failure.  It has detected a shunt and

25 it activates.  That's its job.

1  Q   All right.  But, essentially, I think you testified that when

2  there is a shunt, meaning not an actual train but something else

3  causing the track to show as occupied, the crossing arm is

4  tricked into coming down, right?

5  A   It may be, yes.  They're very sophisticated computers.  They,

6  in general, can detect the difference between an incoming train

7  and a sudden shunt, but, yeah, oftentimes they will still come

8  down and recover if a shunt is dropped on the track.

9  Q   They can detect the difference --

10 A   Yes.

11 Q   -- between a shunt and an oncoming train?

12 A   Yes.

13 Q   Meaning if there's a shunt, the crossing arm, because they

14 can detect the difference, the crossing arm is not tricked into

15 coming down when it shouldn't?

16 A   It may not activate.  It still -- What I said yesterday is

17 absolutely true.  Once it's seen that shunt, it's only going to

18 look at that shunt.  It is built to recognize trains.  It

19 recognizes a shunt as a train.  Trains don't drop out of the sky

20 in the middle of the block.  The computer is smart enough to know

21 that I don't need the gates right now, this sudden shunt just

22 appeared.  But the computer is also going to continue to monitor

23 that shunt, and because of the electrical nature of the tracks,

24 because there's a shunt on it, it's incapable of looking beyond

25 that shunt, so it's now only looking at that.

1    Q    Got it.

2         So you talked about how that process is the warning system

3    for anyone who might be crossing the rails, right?

4    A    Correct.

5    Q    And the warning system, this warning system comprises

6    basically of lights at the crossing arms, right?

7    A    Correct.

8    Q    It comprises of an actual physical barrier, usually the arm

9    which covers the road?

10   A    Correct.

11   Q    It might comprise of a bell too, right?

12   A    Yes.

13   Q    And that's a bell we're all familiar with, right?

14   A    Correct.

15   Q    But you're saying, though, that because of the sophistication

16   of this system, that the system would recognize if there is an

17   operable shunt and it would recognize it as a shunt, right?

18   A    I think I follow you.  Yes.

19   Q    And because the sophistication of the crossing-arm system

20   works, that crossing arm is not going to come down if it's a

21   shunt?

22   A    It may not.

23   Q    It may not.  Okay.

24        The bells may not ring if it's a shunt?

25   A    Correct.

1    Q    The lights may not flash if it's a shunt?

2    A    Correct.

3         If we're testing, we don't want to hold up the traffic while

4    we're testing in the circuit.

5    Q    Sure.

6         So the thing is, then, that a shunt may not affect the

7    operation of that railroad crossing signal, right?

8    A    No, that's not true.

9    Q    Well, you are saying that the arms may not come down --

10   A    True.

11   Q    -- right?

12   A    The road may not be blocked by the gates, the lights might

13   not be flashing, but the system is now only monitoring the shunt,

14   when the system was built to monitor the entire track circuit.

15   So it is affected, its operation is definitely altered; however,

16   we have allowed traffic to continue flowing through.

17   Q    You mean car traffic?

18   A    Car traffic, yes.

19   Q    But you also testified that a shunt might cause a train to

20   slow down and stop, right?

21   A    It could.

22   Q    And so if a train happened to be coming through the area and

23   there's a shunt, the occupied block that is created by that shunt

24   will tell the train to stop?

25   A    Yes, if the train has not yet reached the block where the

 1  shunt is present.  Remember, the train only sees a signal once

 2  every two miles, right?  They only gain new information about the

 3  way ahead once every -- at the entrance to each block.  If

 4  they're past the signal in which the entering -- if they're past

 5  the signal at the entrance to the block in which the shunt was

 6  placed, they would have no knowledge of the shunt after that

 7  point.  Is that clear?

 8  Q   Yes.  Although I have a clarification question.  I mean, if a

 9  train has already passed the signal where the shunt is placed --

10  A   Correct.

11  Q   -- you're saying the train would have no knowledge of that

12  shunt because it has already passed it?

13  A   Well, the train's engineer would have no knowledge because he

14  can't visually see the signal anymore, he's past it.

15      PTC --

16  Q   Right.

17  A   -- however, is a GPS-based system, it's also monitoring the

18  track, so PTC would know that -- Well, how would that work?

19      Yeah.  In general, once they were in the same block that the

20  shunt was in, there's no additional information, the block is

21  already shunted.

22  Q   Right.

23      But you testified that these blocks are maybe two miles long,

24  right?

25  A   Correct.

1    Q    And a train might be a mile long, right?

2    A    Oh, sure.

3    Q    In fact, it could be longer?

4    A    Much longer.

5    Q    Much longer.

6         And so if a train is on a block, the train could cover the

7    whole block, right?

8    A    Yeah.

9    Q    Okay.  So if a train has passed the signal in that block,

10   doesn't that also mean that the train is actually on those

11   tracks?

12   A    Yes.

13   Q    And so how could it be, then, that a person or someone would

14   place a shunt when a train is on those tracks?

15   A    Would you want me to speculate on that or --

16   Q    We will move on.

17   A    Okay.

18   Q    Now, you talked about crossing-arm problems, meaning how

19   shunts can cause crossing arms to not come down or maybe come

20   down.

21   A    That's not a problem.  That's by design.  That's intentional.

22   We need to be able to test our system.  We don't necessarily want

23   to stop all the cars while we're testing our system.  We want to

24   stop the cars when the train is in the circuit.

25   Q    So what is a crossing-arm failure, or an activation failure

1   of a crossing arm, are you familiar?

2   A    Yes.

3        The term "activation failure" is a railroad term used to

4   indicate that the crossing failed to detect a train, that the

5   lights did not come on, that the gates did not drop, that the

6   bell did not ring, and that there was no warning at the crossing

7   when the train got there.

8   Q    Got it.

9        So, yesterday, when you were talking about how there's this

10  danger if the train, an oncoming train, does not have enough

11  warning, the crossing arm doesn't come down in time, that's an

12  activation failure; am I getting that right?

13  A    That's correct, yes.

14  Q    Okay.

15  A    That's a term from the government.

16  Q    All right.  And you worked in Wenatchee for a little while;

17  is that right?

18  A    Yes.

19  Q    And in Wenatchee, you actually caused an activation failure?

20  A    I did.

21  Q    You were suspended for that?

22  A    Yes, I was.

23  Q    Okay.  So you are really familiar with activation failures?

24  A    Very much.

25  Q    Got it.

1      During an incident like an activation failure, that's when

2   the bells don't ring, right?

3   A    Correct.

4   Q    The lights don't flash, the crossing arm doesn't come down?

5   A    That's correct.

6   Q    Isn't one way to know that that's happened is to be there and

7   to witness that it didn't work?  Like how would we know -- How

8   did you know that there was an activation failure when you caused

9   one?

10  A    The train crew reported it.

11  Q    Got it.

12       So the train crew flew through this --

13  A    No.  The train crew detected that the lights were not active,

14  they stopped their train, they flagged it, they stood in the

15  street, had one member drive the train across, they got back on

16  the train, and then they called in and said we have an activation

17  failure at this crossing.

18  Q    Got it.

19       So the crew, the people who were actually on the train going

20  on the rails, they actually saw that there was a problem with a

21  particular crossing arm --

22  A    They did in that case.

23  Q    -- and they avoided that problem?

24  A    Yes.

25  Q    So it's true, then, that one of the main ways that we know

1  about activation failures is through someone seeing a problem and

2  then reporting it?

3  A   That's correct.

4  Q   Okay.  A few final questions.

5      On the night that the shunt in this particular case was

6  placed, you didn't actually respond to the scene; is that right?

7  A   That's correct.  I was not there.

8  Q   So you weren't there to see the crossing arm not come down or

9  come down, right?

10 A   That's correct.

11 Q   You weren't there to measure the distance between the

12 crossing and the wire where it was found, right?

13 A   No.  We measured it after the fact.

14 Q   You didn't do that?

15 A   I did not measure it.  My team did measure it after the fact.

16 Q   Got it.

17     You weren't there to sort of examine the shunt and see if it

18 worked or how it worked or where it was placed, right?  You

19 didn't see any of that?

20 A   Me personally, no.

21 Q   Got it.

22     And, finally, there was no actual train involved in this

23 incident, right?

24 A   Not to my knowledge.

25          MR. SANDERS:  No further questions.

1    THE COURT:  Any redirect for this witness?

2         MR. KOPCZYNSKI:  Yeah.  Just briefly, Your Honor.

3    ///

4                      REDIRECT EXAMINATION

5    BY MR. KOPCZYNSKI:

6    Q   So, Mr. Shaffstall, there's just a couple of things I want to

7    return to from your direct.  But, first, you were asked about an

8    incident in which you were responsible for an activation failure;

9    is that right?

10   A   That's correct.

11   Q   When did that occur?

12   A   It was 2001.

13   Q   Okay.  And was your testimony that you were suspended for

14   that?

15   A   I was, yes.

16   Q   So tell us a little bit more about what happened.

17   A   I was working on the crossing.  I disabled it so I wouldn't

18   stop -- It's a rather busy street, so I disabled the crossing so

19   I could perform work without holding up traffic, and I was

20   interrupted and my attention went off of what I was doing and I

21   left it disabled.

22        This was a bit of a special case because it's in a yard;

23   trains are moving very slow, they're working in there.  And

24   shortly after I left the site, the work crew went to move their

25   train, they saw that the gates didn't activate, and they called

1  it in.

2  Q   Okay.  And so as a consequence of that mistake, you said you

3  were suspended.  Did anything else happen to you in your career?

4  A   No.  That was -- I was suspended for 30 days, with another 30

5  on paper, and then I was on what they call probation for three

6  years.

7  Q   Okay.  So it sounds like that was a pretty severe learning

8  experience for you?

9  A   It was indeed.  I learned a lot.

10  Q   And is the fact of that suspension reflective of the fact

11  that messing around with a crossing system is such a serious

12  business?

13  A   Yes, sir.

14  Q   It's a very serious mistake, right?

15  A   Yes.

16  Q   So you were asked a lot about crossing systems, and I want to

17  just make sure we're clear here.  In particular, on the shunt

18  found last November, you explained on the one hand that the gates

19  and the lights, the bell, that may or may not activate at the

20  moment the shunt is placed, correct?

21  A   Correct.

22  Q   But you also were talking about that concept of warning time,

23  right?  So, please, if you would again, explain to us that

24  concept.

25  A   To get the planned warning time, we need the full length of

1  track that we have planned in.  We have done a calculation to say

2  to get 100 percent of our time, we need this much track.  In this

3  case, it was planned for 34 seconds.  And I have looked up this

4  crossing.  The train runs at 45 miles an hour, so it's roughly

5  66 feet per second.  If we want 34 seconds, it's a simple

6  calculation to say, well, then we need to terminate the circuit

7  at this point.

8  Q    But what does the shunt do to that termination point?

9  A    It takes the shunt out of the circuit just in the same way

10 that that previous example showed, the one that was on the board

11 a moment ago.  It showed the train wheel deenergized the relay,

12 because the train wheel was between the battery and the relay.

13 The shunt placed between the crossing and its intended

14 termination means we can no longer look at that termination; we

15 can only look as far as that shunt.

16 Q    So regardless of whether the crossing activates at the moment

17 the shunt is placed, tell us, again, what would the shunt here

18 have done to that warning time for activation?

19 A    With the shunt in place, as the train approached the circuit,

20 it would not be detected at the time it was supposed to be

21 detected and the train would continue through the circuit until

22 the point that it crossed the shunt.  At that point, the crossing

23 would now recognize the train because now the train is closer

24 than the shunt is, and the crossing would then detect motion and

25 activate the warning system.

1          MR. KOPCZYNSKI:  I have no more questions.

2          THE COURT:  Anything further, Mr. Sanders?

3          MR. SANDERS:  One final question.

4          THE COURT:  All right.

5                         RECROSS-EXAMINATION

6   BY MR. SANDERS:

7   Q    Just briefly.  We talked about activation failures at the

8   crossing arms.  When there's an activation failure, there has to

9   be a report written, right?

10  A    That's correct.

11  Q    And there was no activation failure report for November 28th,

12  right?

13  A    That is correct.

14         MR. SANDERS:  Nothing further.

15         THE COURT:  Mr. Shaffstall, thank you very much.  You

16  may step down.  You are free to go, sir.

17         THE WITNESS:  Thank you, sir.

18         THE COURT:  And, counsel, the government may call their

19  next witness.

20         MR. KOPCZYNSKI:  Your Honor, the government calls Dane

21  Chambers.

22         THE COURT:  Officer, good morning.  If I could have you

23  step down through the well of the courtroom, come up in front of

24  our clerk, raise your right hand to be sworn prior to testifying.

25

 1                        DANE CHAMBERS,

 2          having been sworn under oath, testified as follows:

 3              THE CLERK:  Thank you.  Please have a seat.

 4       Can you please state your name for the record and spell it

 5    for our court reporter?

 6              THE WITNESS:  Dane Chambers, C-h-a-m-b-e-r-s.

 7              THE CLERK:  Thank you.

 8              THE COURT:  Officer, we're asking all witnesses if

 9    they're comfortable enough to remove their masks while they're

10    speaking, you may do, so that the jury can see your full face and

11    countenance.  And please listen carefully to the questions.  Do

12    your best to answer the question asked.  Don't speak over

13    counsel.  It makes it difficult for our court reporter.  If you

14    don't understand something, just say so, we will try to get them

15    to clarify.

16              THE WITNESS:  Perfect.

17              THE COURT:  You may inquire.

18              MR. KOPCZYNSKI:  Thank you, Your Honor.

19                        DIRECT EXAMINATION

20    BY MR. KOPCZYNSKI:

21    Q    Good morning.

22         Where do you work?

23    A    I work for Whatcom County Sheriff's Office.

24    Q    What's your job there?

25    A    I am a patrol deputy assigned to answer 911 calls for

 1  service and patrol the streets of Whatcom County.

 2  Q    How long have you had that job?

 3  A    Six years.

 4  Q    What sort of shift do you work?

 5  A    Generally, I work graveyard shift, which is eight o'clock in

 6  the evening until 6:00 in the morning.

 7  Q    Okay.  So you would ordinarily be sleeping right now?

 8  A    Correct.

 9  Q    Your entire six years, have you been a patrol deputy?

10  A    I have, yeah.

11  Q    So in that job, do you receive training in the

12  responsibilities of the job?

13  A    Absolutely.

14  Q    Tell us a little bit about that, please.

15  A    Before starting on the road, we have about a six-month police

16  academy that we have to accomplish, and then we have field

17  training, which is three months with different officers riding in

18  our vehicle with us, teaching us, and then we have annual

19  training as well.

20  Q    Okay.  On November 28th of last year, did you receive a call

21  about trespassing on railroad tracks?

22  A    I did.

23  Q    Do you recall around what time that came in?

24  A    Not exactly, but it was late in the evening, like 10:00 or 11

25  o'clock.

1   Q    Okay.  Would seeing the CAD report refresh your recollection

2   of the precise time?

3   A    Absolutely.

4   Q    Okay.

5          MR. KOPCZYNSKI:  Your Honor, if I may, I will refresh

6   with the report on the screen instead of approaching the witness.

7          THE COURT:  You may.

8          MR. KOPCZYNSKI:  Okay.  So I will make sure we are not

9   published.

10  Q    And, Deputy Chambers, I will move through this, and please

11  tell me when --

12  A    It looks like -- well, if you could go back.

13  Q    Oh, sure.

14  A    I think it looks like --

15  Q    So instead, just to be clear, if you would just read silently

16  to yourself and then I will ask the question again.

17  A    Oh, got it.  Yep.  Thank you.

18  Q    Would you like me to go through more pages of your report, or

19  did that refresh your recollection?

20  A    That refreshed my recollection.

21  Q    Okay.  So I will ask again -- and this time, I guess, I will

22  ask for a little more precision -- around what time did you

23  receive that call?

24  A    That would be 2329 hours, or 11:29.

25  Q    Okay.  And so, again, the nature of the call was what?

1    A    Trespassers on the railroad.

2    Q    Did you understand, when that call came in, who the reporting

3    party was?

4    A    Yes.

5    Q    Who was it?

6    A    BNSF --

7    Q    Okay.

8    A    -- Police, yeah.

9    Q    Where were you?  Out on patrol?  At the station?  Where were

10   you when you got that call?

11   A    I was out on patrol.  Each night, we change areas in Whatcom

12   County, and the county is divided into four patrol areas, and so

13   I was working in the Sam 3 area, which is the southwest section

14   of the county.

15   Q    Okay.  So what did do you when you got that call?

16   A    I responded to the area.

17   Q    Were you working with anyone that night?

18   A    Yeah.  We generally have four'ish deputies on, each night,

19   uh-huh.

20   Q    Were any of those deputies in the car with you or working

21   somewhere else?

22   A    No.  Working in their own vehicles.

23   Q    Okay.  Did any other deputies respond to the same call with

24   you at the outset?

25   A    Yeah.  Deputy Streubel responded as well.

1   Q   But he's in a different call?

2   A   Yep.

3   Q   So what was your plan for the response?

4   A   Deputy Streubel responded -- The original call was that the

5   trespassers were walking southbound on the tracks, and so Deputy

6   Streubel responded further south on the railroad tracks and

7   reported that he was walking up the tracks, and I responded a

8   little bit north, thinking that I would walk down and we would

9   meet each other in the middle.

10  Q   Got it.

11      So where did you end up putting your patrol vehicle?

12  A   I pulled onto Cliffside Drive and just drove my patrol

13  vehicle right up onto the railroad crossing there on the road

14  and shined my spotlight both north and south.

15  Q   Okay.  So before we get into that, I just want to make sure

16  we're situated.  So this area where you were responding was

17  familiar to you it sounds like?

18  A   Very, uh-huh.

19  Q   So let's look at a couple of maps.

20          MR. KOPCZYNSKI:  Your Honor, I will put on the screen an

21  exhibit that we have admitted.  This is Exhibit 32, Government's

22  32, and we will publish.

23  Q   So, Deputy Chambers, what does this map show?

24  A   That shows the general area of Cliffside.  Well, the yellow

25  dot.  This is Whatcom County.

1  Q   So sort of a wide-out view of your patrol area?

2  A   Yeah.

3  Q   And then that little dot, is that around Cliffside Drive?

4  A   Yeah.

5  Q   And a little blow-up there in the lower left?

6  A   Yep.

7  Q   Okay.  So let's look a little more closely.  I will now put

8  up another admitted exhibit, Government's 33.

9      What are we seeing here, Deputy Chambers?

10  A   That's a more detailed map there of the area, including

11  Cliffside Drive.

12  Q   Okay.  You should be able to draw on the screen with your

13  finger or there's a stylus there.  If you could just maybe put a

14  little check or X next to the Cliffside Drive crossing where you

15  parked your car.

16  A   (Witness complied with counsel's request.)

17  Q   Okay.  And then we will do one more, which is Exhibit 34,

18  also admitted.

19      So, once again, if you could -- now we have the satellite

20  version -- Deputy Chambers, again, maybe a little X or a check

21  where you parked.

22  A   (Witness complied.)

23  Q   Got it.

24      Okay.  So you parked there.  How was the weather that night?

25  A   It was cold.  Clear, but cold.

1   Q   Cold enough for there to be frost on the ground?

2   A   Absolutely, yeah.

3   Q   Okay.  And how was the lighting out there?

4   A   Dark.

5   Q   You said it was near midnight?

6   A   Uh-huh, yeah.  And no streetlights over there.

7   Q   Okay.  So what happens next?

8   A   When I pulled onto the tracks, I checked northbound on the

9   railroad tracks there with my large spotlight and I could see a

10  subject in the middle of the tracks about a 100 yards, maybe

11  200 yards north.  And so I exited my patrol vehicle and started

12  walking towards them, and I identified myself by shouting

13  "Sheriff's Office."

14  Q   So let me stop you there real quick.  Are folks allowed to be

15  out there on the tracks?

16  A   No.  No.

17  Q   How come?

18  A   That would be trespassing.

19  Q   So, again, I stopped you.  Continue.  What was next?

20  A   I identified myself by shouting "Sheriff's Office," and

21  that's when I could tell that it was two subjects crouched down

22  in the middle of the tracks.  One of them got up and moved kind

23  of towards the trees a little bit.  And as I was walking out

24  towards them, they began to leave northbound along the tracks.

25  Q   Walking away from you?

 1   A    Away from me, uh-huh.

 2   Q    So what did you do then?

 3   A    I jogged towards them and I told them to stop and come talk

 4   to me, and I heard a female voice say, "Okay," and then they

 5   turned and started walking towards me.

 6   Q    Okay.  So did you later identify who those two people were?

 7   A    I did.

 8   Q    Who were they?

 9   A    Samantha Brooks and Ellen Reiche.

10   Q    Do you see Ellen Reiche in the courtroom today?

11   A    Yes.

12   Q    Could you identify her for the record by describing the

13   clothing she's wearing?

14   A    A gray button-up shirt and a blue medical mask.

15        MR. KOPCZYNSKI:  Your Honor, will the record reflect

16   that the witness has identified the defendant?

17        THE COURT:  It will so reflect.

18   Q    So, that night, how were both of those people, Brooks and

19   Ms. Reiche, how were they dressed?

20   A    Black, head to toe.  Mask, shirt, jacket, pants.  Everything

21   was black.

22   Q    Both of them?

23   A    Uh-huh.  Yes.

24   Q    Did you notice anything about the appearance of their

25   clothing?

1  A    There was fresh dirt on the knees and kind of stomach and

2  things, uh-huh.

3  Q    Was the defendant holding anything?

4  A    Yes.  A paper bag.  Well, two paper bags, one inside the

5  other.

6  Q    Like a double-bagged --

7  A    Yeah, a double-bagged grocery --

8  Q    -- situation?

9  A    -- yeah, grocery bag.  Uh-huh.

10  Q    Okay.  Did you talk to them?

11  A    I did, yeah.

12  Q    Did you ask why they were out there on the tracks?

13  A    I did.

14  Q    What did they say?

15  A    They were looking for lost keys.  They told me they had been

16  out there earlier in the day and had lost a set of keys and had

17  returned to find those keys.

18  Q    Okay.  So did they have flashlights?

19  A    No.

20  Q    How about cell phone flashlights?

21  A    No.

22  Q    Any source of light at all?

23  A    None.

24  Q    Did they say who drove to the tracks that night?

25  A    Yeah.  Ellen.  Ellen drove.

 1   Q   The defendant?

 2   A   Uh-huh.  Yes.

 3   Q   Did Brooks, in fact, appear to be carrying keys?

 4   A   Yes.

 5   Q   How did you know that?

 6   A   When a question arised about cell phones, asking about the

 7   lights and things, she reached into her pockets and pulled out

 8   the contents of her pockets, kind of showing, and there were

 9   keys.

10   Q   Did you ask about that?

11   A   Yes.

12   Q   What was the answer?

13   A   That they were different keys to a -- not to the current

14   house.

15   Q   So those weren't the lost keys?

16   A   Correct.

17   Q   Okay.  You mentioned cell phones.  Did you ask if they had

18   their cell phones even on them?  Whether they had them out using

19   the flashlight or not, were they carrying cell phones?

20   A   They were not.

21   Q   They were not.

22       Did you offer to help find the keys?

23   A   I did.

24   Q   What did they say?

25   A   I can't remember exactly, but it was declined, not necessary.

1    Q    Okay.  Now, how about that bag, did you ask what's inside

2    that bag?

3    A    I did.

4    Q    What was the answer?

5    A    It was alluded to that it was food, leftovers.

6    Q    Okay.  So did you ask any more questions about that?

7    A    I did.  I asked, because it was so close to Thanksgiving, I

8    said, "Oh, is it Thanksgiving leftovers?" and it was agreed,

9    "Yes, Thanksgiving leftovers."  When I asked how their

10   Thanksgiving was, Samantha quickly stated that she doesn't

11   celebrate Thanksgiving or believe in Thanksgiving, and then Ellen

12   nodded in agreeance to that.

13   Q    Okay.  So they don't celebrate Thanksgiving, but it's

14   Thanksgiving leftovers in the bag?

15   A    Correct.

16   Q    At some point in that sort of conversation with them, did you

17   make any jokes about things that might be in the bag?

18   A    I did.  I did.

19   Q    What did you say?

20   A    I had heard of a thing called shunting, but I didn't

21   understand it completely, but I knew that it involved railroad

22   tracks and vandalism and possibly jumper cables.  And so I joked

23   and asked, I said something along the lines of, "There's not

24   jumper cables in your bag?" and Ellen replied by saying that she

25   was an electrical-tarian {phonetic} and only eats conductive

 1  materials, just as a joke, and ...

 2  Q    Okay.

 3  A    Uh-huh.

 4  Q    How long were you out there on the tracks chatting with

 5  Brooks and the defendant?

 6  A    Probably five to ten minutes.

 7  Q    What happened after that?

 8  A    Deputy Streubel arrived shortly after that.  And when I got

 9  their names, I returned to my patrol car, while Deputy Streubel

10  was talking with them and walking towards the patrol vehicle, and

11  I ran their names to verify and make sure they are who they said

12  they were.

13  Q    Okay.  And were any other officers going to respond?

14  A    At that point, I don't know.  I didn't know if any other

15  officers were responding.  But, later, I know that BNSF said that

16  they were going to respond and asked us to wait for them.

17  Q    Okay.

18  A    Uh-huh.

19  Q    When you first saw the two subjects out there on the tracks,

20  what time was that?

21  A    Well, I don't know exactly.

22  Q    Did you once know?

23  A    I did, yes.

24  Q    And would seeing your CAD report -- the scene's op CAD report

25  refresh your recollection?

1    A    It would.

2    Q    Okay.  So I will put that up again.  And if you could, again,

3    just please read it silently and then I will ask that question.

4         And if you want me to go forward or backward, just tell me to

5    page forward or backward.

6    A    Forward.

7         Forward.

8         Forward.

9    Q    I will just keep paging through.

10   A    Wait here just one second.

11        And what was your question again?

12   Q    So my question was, around when did you actually see the

13   subjects out there crouched down in your spotlight on the tracks?

14   A    At 2346 is when I announced on the radio that I was out with

15   the subjects on Cliffside.

16   Q    Okay.  So, again, that's 11:46?

17   A    Correct.

18   Q    I'm sorry.  I know that's a little more awkward than usual,

19   but it minimizes me having to walk up there.

20        A few more questions then.  So you're back at your vehicles,

21   but then at some point did you go back out to the tracks?

22   A    I did.

23   Q    Why did you do that?

24   A    An FBI Agent, Shulman, Shull -- I can't remember his name,

25   but it's in my report.  Anyways, he arrived and he kind of

 1  explained to me a little bit more what possible damage had been

 2  done to the tracks in the area or the history of shunting.  And

 3  so after he explained it to me more, I walked him back out to

 4  where I first saw Ellen and Samantha.

 5  Q    Okay.  So you got back out to that spot where you saw them --

 6  A    Uh-huh.

 7  Q    -- and what happened next?

 8  A    There was frost on the ground.  I was looking for, like, big

 9  jumper cables or something connecting the tracks, very obvious.

10  And as he explained further, that generally the wires connecting

11  the tracks are buried and hidden.

12       I held my flashlight down at my side and shined it along the

13  ground at a lower level, and I could see the frost on the ground,

14  and then there was a section that there wasn't any frost on and

15  it was freshly disturbed dirt.  So I walked over to that area,

16  looked straight down, and saw a black wire buried there in the

17  ground or in the dirt.

18  Q    That spot where you found that wire, where was that in

19  relation to where you first saw the defendant?

20  A    Exactly where they were.

21  Q    Okay.  Let's look at some pictures.  All of these are already

22  admitted.

23       Okay.  The first one, the orientation is not landscape, but

24  what's that first one?

25  A    It looks like a picture of the railroad tracks.

1   Q   Okay.  The next one -- Did you take pictures?

2   A   I did.

3   Q   What's that one?

4   A   It's a picture of the wire that was buried under the ground

5   connecting the two rails together.  The shunt.

6   Q   Okay.  And this area here on the left that I've indicated,

7   what are we seeing there?

8   A   That is the bottom of the rail for the train track.

9   Q   Okay.  You said you weren't totally familiar with shunting,

10  but did you notice anything about that section of the rail and

11  did it look at all different than other parts of the rail?

12  A   It was cleaned to make a good connection, I believe.

13  Q   Okay.  The next one, I'm going to show you page 27 of

14  Exhibit 26.  And let me clear that out.

15      So in this one I see a flashlight.  What else are we seeing

16  here?

17  A   The large concrete tie, just to the left of it, you can see

18  the wire, the black wire shunt that's buried.

19  Q   It looks like some rocks in this picture have been disturbed.

20  Who did that?

21  A   So I did not take this photograph here.  But Deputy Streubel

22  and BNSF Police Nies, Police Chief Nies, had gone back out and

23  uncovered the shunt.  So I believe that that would have been

24  Chief Nies that had done that.

25  Q   Okay.  But just so that we're clear then, that's not quite

 1  how it looked when you first found it?

 2  A   Correct.

 3  Q   Yeah.  But it's being uncovered at this point?

 4  A   Correct.

 5  Q   Okay.  A couple more.  This will be page 30 of Exhibit 26.

 6  So what do we see here?

 7  A   That's Chief Nies's hand on top and Deputy Streubel's hand

 8  down below uncovering the shunt.

 9  Q   And it's just a little hard to see, but maybe if you could

10  just draw on it, where is the shunt in that picture?

11  A   (Witness complied.)

12  Q   Right.  Okay.  Thank you.

13      This next one will be page 31 of Exhibit 26.  How about in

14  this picture, where is the shunt?

15  A   (Witness complied.)

16  Q   Okay.  Thank you.  I will clear that.

17      This will be page 32 of Exhibit 36.  I'm sorry.  I misspoke.

18  Exhibit 26, page 32.  The same thing if you could, please,

19  Deputy, just indicate for us?

20  A   (Witness complied.)

21  Q   Okay.

22      And one more, page 35 of Exhibit 26?  So I will clear first

23  and then if you could, please?

24  A   (Witness complied.)

25  Q   So is this one looking a little more closely to how you found

 1  it?

 2  A    Correct.

 3  Q    Down there under the rocks?

 4  A    Yes.

 5  Q    Okay.  I can't avoid a little walking around, but, Deputy

 6  Chambers, I'd like to bring you, with the Court's permission,

 7  what we have premarked and admitted as Government's 36.

 8       THE COURT:  Counsel, if we're going to shift gears at

 9  this point in time, maybe we could take our morning break for the

10  court reporter at this point?

11       MR. KOPCZYNSKI:  Of course.

12       THE COURT:  Ladies and gentlemen, we will go ahead and

13  take a short 10- to 15-minute break or so, and we will, again,

14  have you go back into Judge Jones' courtroom and we will bring

15  you back in about 10 to 15 minutes.

16    (The following occurred outside the presence of the jury.)

17       THE COURT:  All right, counsel.  We will stand at

18  recess.

19       MR. CANTOR:  Thank you.

20                          (Recessed.)

21       THE COURT:  Ready for our jury?

22       MR. KOPCZYNSKI:  Yes, Your Honor.

23       MR. CANTOR:  Yes.

24       THE COURT:  Bring them in.

25     (The following occurred in the presence of the jury.)

 1          THE COURT:  And you may all be seated.  Thank you.

 2      Welcome back, ladies and gentlemen.  I know two small

 3   bathrooms for 13 people doesn't work really good.

 4      Welcome back.  We're ready to proceed with our morning

 5   session once again.

 6      And, counsel, I believe you were still on direct.

 7          MR. KOPCZYNSKI:  Thank you, Your Honor.

 8   Q   So, Deputy Chambers, we were talking about you finding that

 9   wire shunt out on the tracks.

10          MR. KOPCZYNSKI:  And with the Court's permission, I will

11   approach the witness with what we have premarked as Government's

12   36.  And this is already admitted.

13          THE COURT:  You may approach.

14   Q   Deputy Chambers, do you recognize Government's 36?

15   A   Yes, I do.

16   Q   What is that?

17   A   The black wire.  Well, the black-coated copper wire.

18   Q   Would you go ahead and open it up, please, and hold it up so

19   the jury can have a look?

20   A   Am I going to need to cut it?

21   Q   I believe it should be sealed.  Is the bag sealed?

22   A   It is.

23   Q   So please go ahead and cut it open.

24   A   (Witness complied.)

25      Do you want it out of this bag as well?

 1   Q   Yes, please.

 2       What's that additional bag in there?

 3   A   This is from BNSF, their evidence bag.

 4   Q   Got it.

 5       Yeah, so please go ahead and open that.

 6   A   (Witness complied.)

 7   Q   So, again, we will keep distanced, but if you could, from

 8   where you are seated there, just go ahead and kind of show it,

 9   hold it up, so that, hopefully, everybody can get a look.

10   A   (Witness complied.)

11   Q   Okay.  Thank you.

12   A   Uh-huh.

13   Q   So you found that wire that you have now just shown the jury

14   out there on the tracks.  Did you decide to arrest the defendant,

15   Ms. Reiche and Brooks?

16   A   Yes.

17   Q   Now, remind us, where was Deputy Streubel during that?

18   A   He was standing -- We had all moved now to the front of my

19   patrol car, still parked on Cliffside Drive.

20   Q   When did he first join you, Deputy Streubel?

21   A   When I was first contacting Ellen out on the tracks.

22   Q   I see.  Okay.

23       But then you were all back at the car?

24   A   Uh-huh.

25   Q   And you decide to arrest them.  Did you take photographs of

1    the two subjects?

2    A    Yes, I did.

3    Q    So let's look at that.  I will show you page 3 of Exhibit 26.

4    This is admitted.  And I will publish that for the jury.

5         What's that?

6    A    That's a picture of Ellen.

7    Q    Okay.  And is this consistent with her appearance that night?

8    A    Yes.

9    Q    And what you have described to us about her outfit?

10   A    Yes.

11   Q    Okay.  Let's get one more.  I have a couple of questions.

12   This will be page 4 of Exhibit 26.  What is that picture?

13   A    The pants and shoes.  Ellen's pants and shoes.

14   Q    Okay.  All in black?

15   A    Correct.

16   Q    And I'll expand.

17        What did you observe about the knee area on the front of her

18   pants?

19   A    It's the fresh dirt.

20   Q    Like you testified earlier?

21   A    On the knees, correct.

22   Q    I will show you now page 17 of Exhibit 26.  Oops.  I messed

23   that up.

24        What is that picture?

25   A    That's a picture of Samantha Brooks.

1    Q    Okay.  And Ms. Brooks is dressed similarly?

2    A    Correct.  All black.

3    Q    Whose car is that in the background?

4    A    I'm not sure.  It could be Sergeant Gerbil's or Deputy

5    Vanderbeen.

6    Q    But to help us be situated, where was this all happening?

7    A    This is on Cliffside Drive, and they would have been parked

8    either directly behind my patrol car or two back.  They both

9    responded to assist later on.

10   Q    Right.

11        Still in that area of the Cliffside Drive crossing?

12   A    Correct.  On Cliffside Drive, yep.

13   Q    Now, you are in that area, and what had happened to that bag

14   that you said the defendant was carrying?

15   A    Well, I placed Samantha Brooks in handcuffs and put her in

16   the back of my patrol car, and when I came back to the front of

17   my patrol car, where I had been standing earlier with Deputy

18   Streubel and both Ellen and Samantha, when I had come back up

19   front there, Deputy Streubel had placed Ellen in handcuffs and

20   the bag that she had been holding was sat on the ground where she

21   had been standing.

22   Q    Had the defendant been holding that bag the entire time up

23   until that moment you saw it sitting on the ground?

24   A    From the moment I first made contact, yes, until the moment

25   that she was placed in handcuffs.

1  Q   Okay.  And at any point had she sort of held it in such a way

2  that you might be able to catch a glance in there or --

3  A   No.  She --

4  Q   -- was it more closely --

5  A   -- yeah, held on to it tightly.

6  Q   But then she's handcuffed, it's on the ground.  And at that

7  point did you have legal authority to look inside the bag?

8  A   I did.

9  Q   And did you look inside the bag?

10  A   I did.

11  Q   What did you see inside?

12  A   Inside the bag was more copper wire, like this wire.  There

13  was a drill with a wire -- a brass wire brush on it, scissors,

14  and some gloves.

15  Q   I'm going to show you Exhibit 24.  This is admitted.  What is

16  this?

17  A   That's a picture of the paper bags Ellen was holding.

18  Q   Okay.  So now, you know, to minimize trips, I will bring you

19  a number of items separately bagged.

20        MR. KOPCZYNSKI:  Your Honor, for the record, these are

21  all collectively marked as Exhibit 35, which is admitted.

22  Q   I will take back Exhibit 36, and I'll leave you several

23  items, Exhibit 35.

24        MR. KOPCZYNSKI:  If I may approach, Your Honor?

25        THE COURT:  You may.

1    Q    So, Deputy, I have handed you what we have premarked

2    Exhibit 35.  It is admitted.  And if you could, please, sort of

3    in the order I went through, tell us if you recognize what is in

4    front of you and then go ahead and cut it open and show the jury,

5    please.

6    A    Yeah.

7    Q    So starting with that one right on top.

8    A    Yes.

9         This is a bag that I placed in evidence -- my name is on it

10   here -- at the sheriff's office, and it says that it's containing

11   some tools.

12   Q    Okay.  So go ahead and open that up.

13   A    (Witness complied.)

14        Correction.  The label says "Paper bags," which contains the

15   tools, so ...

16   Q    So you have that out of the evidence bag there.  Do you

17   recognize that?

18   A    I do.

19   Q    What is that?

20   A    These are the paper bags that Ellen was holding that had the

21   tools inside of them.

22   Q    Okay.  If you could then -- let's go on to the next items I

23   handed you.  All of this is admitted, so you are free to just

24   open it up and let us all have a look.

25   A    Okay.  Okay.

1    Q   So what do you have there?

2    A   This is double-sided magnet -- magnetic sticky tape.

3    Q   Okay.

4    A   This was --

5    Q   I'm sorry.  Go ahead.

6    A   Oh.  This was -- this roll was also located inside of the

7    bags.

8    Q   And if you could keep going, please.

9        What's that one?

10   A   Scissors, also located inside the bag.

11   Q   Okay.  Do you have a space there, or do you want me to go

12   collect any of that?

13   A   I have space, if it's all right that any of them are on the

14   floor.

15   Q   Yep, that's okay.

16   A   Okay.

17   Q   What's that one?

18   A   More copper wire, black-coated copper wire that was also

19   inside the bag.

20   Q   Okay.  And, Deputy, what was that one?

21   A   These are the rubber gloves that were inside the bag.

22   Q   Okay.  And what do you have, one more there?

23   A   Correct.

24   Q   Okay.  Let's open that one up.

25   A   (Witness complied.)

 1  Q   So you are holding that up nice and high, but for the record,

 2  what's that one?

 3  A   It's a cordless Makita drill with a brass brush bit in it.

 4  Q   Okay.  I will come collect those.

 5          MR. KOPCZYNSKI:  And I have no more questions.

 6      May I approach, Your Honor?

 7          THE COURT:  You may.

 8      Cross-examination, Mr. Cantor.

 9          MR. CANTOR:  Thank you, Your Honor.

10      Just as we did with the government's exhibits, we have

11  entered into a stipulation to preadmit Exhibits A-1 through A-12.

12  A-1 through A-12.

13      So, with that, Your Honor, I would move to admit and have

14  permission to publish to the jury as needed.

15          THE COURT:  All right.  Madam Clerk, A-1 through A-12

16  admitted.

17          THE CLERK:  Thank you.

18              (Exhibit Nos. A-1 - A-12 admitted.)

19                  CROSS-EXAMINATION

20  BY MR. CANTOR:

21  Q   Good afternoon, Deputy Chambers.

22      You're familiar with this particular area that you

23  investigated?  You had been there before, correct?

24  A   Yes.

25  Q   And I know counsel showed you a map.  I want to show you a

 1   couple Google maps just to make sure that, you know, we're all on

 2   the same page with respect to this location.

 3   A    Okay.

 4   Q    So let's pull up Exhibit A-10.

 5          MR. CANTOR:  Ms. Cuaresma, I think we need to push a

 6   button maybe.

 7          There we go.

 8   Q    So you recognize this as the area that you responded to,

 9   right?

10   A    Yes.

11   Q    And that red dot there, that would be the location of where

12   you arrested the two trespassers, correct?

13   A    That's where I contacted them first, yeah.

14   Q    Okay.  And if we go to -- Let's take a look at A-12.  That's

15   like a closer view of this particular area, right?

16   A    Yes.

17   Q    We see the Cliffside Drive railroad crossing right next to

18   Marine Drive Park, right?

19   A    Correct.

20   Q    And then the railroad tracks run alongside the park?

21   A    Yes.

22   Q    And I'm going to also show you some photographs of what this

23   area looks like in daylight so we all have an understanding of,

24   you know, the dimensions and the environment.  So let's pull up

25   A-1.  This would be the vantage point from the railroad crossing

1    looking north; would you agree with that?

2    A    Yes.

3    Q    And in this vantage point, where you are, or where this

4    photograph is taken, at the actual railroad crossing, you would

5    be able to see the suspects had you shown your spotlights in that

6    direction at that time, right?

7    A    Yeah.

8    Q    In other words, I guess a better way of phrasing it is that

9    the two trespassers, the two suspects, would have been on the

10   tracks before the tracks bent out of view; would you agree with

11   that?

12   A    Correct, yeah.

13   Q    So when you say that you noticed them about 100 yards to the

14   north, this depicts about 100 yards to the north?

15   A    Yeah.

16   Q    Okay.  Let's take a look at Exhibit A-2.  This would be a

17   photo of Marine Drive Park from the railroad crossing, correct?

18   A    Correct.

19   Q    Okay.  And I'm going to show you a one-minute video that sort

20   of does a panoramic view of this entire area.  I just want to see

21   if you agree with it.

22   A    Okay.

23   Q    So if we can just play A-9.

24              (Exhibit A-9 displayed to the jury.)

25   Q    And now we're seeing Marine Drive Park, correct?

 1    A    Correct.

 2    Q    And what we're going to see next are the tracks to the south,

 3    and that's where Deputy Streubel would have been coming from,

 4    correct?

 5    A    Correct.

 6    Q    Okay.  All right.  We can stop it there.

 7         When you arrived and you spotted the two individuals about

 8    100 yards to the north, you noticed them crouching down?

 9    A    Yes.

10    Q    Is that an accurate description?

11    A    Yes.

12    Q    And the area where they were crouching down, that is the same

13    area where this wire was found?

14    A    Correct.

15    Q    When you also arrived, you would agree that you were within

16    speaking distance of these two individuals?

17    A    Loud speaking, yeah.  I shouted to get their attention,

18    uh-huh.

19    Q    And they responded?

20    A    Correct.

21    Q    And, in fact, one of them even said something to the effect

22    of "Okay"?

23    A    Correct.

24    Q    So you could hear their voices pretty decently from where you

25    were?

1    A    Yeah.

2    Q    When you arrived, you didn't hear any drilling, did you?

3    A    No.

4    Q    You didn't hear any machinery, correct?

5    A    Correct.

6    Q    Did you see any sparks flying around from metal scuffing?

7    A    No, I didn't.

8    Q    When you advised the two that they were trespassing, you

9    would agree that they were compliant, correct?

10   A    Correct.

11   Q    They were, I guess it can be described as being cordial,

12   friendly?

13   A    Yes.

14   Q    And you had an occasion to even talk to them about what they

15   were doing?

16   A    Correct.

17   Q    You would agree that you would characterize that

18   communication as even joking, to a certain extent, right?

19   A    Yes.

20   Q    Even lighthearted?

21   A    Lighthearted, sure, yeah.

22   Q    About the time that you are asking about what's in the bag,

23   you would agree that you would describe it as Ellen was joking

24   with you, correct?

25   A    Correct.

1    Q    You were the one that discovered the wire yourself?

2    A    Yes.

3    Q    And you testified it was dark out, right?  You had to use a

4    flashlight --

5    A    Yes.

6    Q    -- to see where this particular wire was located?

7    A    Correct.

8    Q    Without the flashlight, you wouldn't have been able to find

9    the thing, would you?

10   A    No.

11   Q    You were able to retrieve this wire, but is it correct to say

12   that there were no magnets retrieved from this area?

13   A    I don't believe so.  I'm not entirely sure, but I don't

14   believe so.

15   Q    Well, you have the bulk exhibits, correct?

16   A    Correct.

17   Q    And these would be the exhibits that were retrieved from the

18   scene on November 28th?

19   A    Correct.  Correct.

20   Q    No magnets were retrieved, right?

21   A    That role of double-sided sticky tape is magnetic.  It's

22   magnets.

23   Q    That sticky tape was not on the tracks, was it?

24   A    Not that I saw, no.

25   Q    No.

1      What you found on the tracks was just one piece of wire?

2   A   Correct.

3   Q   And the way you described the tape in your report was that

4   it's adhesive tape, correct?

5   A   I'm not sure.  I may have.

6   Q   Let's pull up Bates 773, and that's -- yeah, Bates 773, and

7   this would be the first paragraph.  Do not publish, by the way.

8   Do not publish.

9       Okay.  All right.  Let's look at the very first paragraph,

10  the list of items that were recovered.  You would agree that you

11  recovered tape, correct?

12  A   Uh-huh.

13  Q   The same tape that you showed us, correct?

14  A   Yes.

15  Q   You did not characterize it or describe it as magnetic tape,

16  did you?

17  A   No.

18  Q   No.  You said it was adhesive tape?

19  A   Adhesive, correct.

20  Q   And this tape did not come from the railroad tracks, did it?

21  A   No.  From the bag.

22  Q   Okay.  Got it.

23      Now, one thing that caused suspicion, caused you to be

24  suspicious, was that the two individuals that you encountered

25  that night, including Ms. Reiche, my client, did not have any

1    flashlights with them?

2    A    Yeah.

3    Q    Right.  I mean, that was a little  --

4    A    Which was strange.

5    Q    -- strange to you, right?

6    A    Uh-huh.

7    Q    And that's because it was dark out?

8    A    Correct.

9    Q    It was late at night?

10   A    Yes.

11   Q    And the suspicion arose because of, well, you know, I mean,

12   how are you going to find your keys if you don't have lights,

13   right?

14   A    Yes.

15   Q    Similar to how you would find this wire if you didn't have

16   your flashlight?

17   A    Correct.

18   Q    You would agree that now that you understand what shunting is

19   all about, that to install a shunt, a wire shunt, it's a

20   multi-step progress, correct?

21   A    Yes.

22   Q    All right.  I mean, you have to remove rocks, for example,

23   number one?

24   A    Yes.

25   Q    You have to bury the wire underneath the rocks, number two,

1    correct?

2    A    Yes.

3    Q    You also have to remove rust, apparently, from the railroad

4    tracks, right?

5    A    Yes.

6    Q    And you have to secure the wires?

7    A    Correct.

8    Q    In order for this to work effectively, correct?

9    A    Correct.

10   Q    You would agree that all of that requires there to be some

11   sufficient lighting to see what you are doing, right?

12   A    Yeah.

13   Q    And nobody had flashlights, did they?

14   A    No.

15   Q    Finally, the contents of the bag that you testified about --

16   everything that was on that list that I just showed you, right?

17   A    Uh-huh.

18   Q    -- you turned that over to the FBI, correct?

19   A    I did not.  I submitted it into our evidence, and that's when

20   my involvement in the items ended.  But I do know that it was

21   submitted or turned over to the FBI.

22   Q    Because you are part of this investigation?

23   A    Correct.

24   Q    And, in fact, that evening, that same evening that you are

25   finding this stuff, FBI even comes onto the scene, right?

1    A    Correct.

2    Q    And from what you understand, they took over the

3    investigation at that point; it was no longer a Whatcom County

4    Sheriff investigation, right?

5    A    No.  At that point, I made the arrest and wrote up the

6    probable cause, and I even later was the one that applied for a

7    search warrant and that sort of thing.  So at that point I did

8    not believe that the FBI was taking this investigation, no.

9    Q    Absolutely right.

10        But, subsequently, they did, correct?

11   A    Correct.

12   Q    Okay.  Thank you.

13        MR. CANTOR:  I have no further questions.

14        THE COURT:  Any redirect for this witness?

15        MR. KOPCZYNSKI:  Well, sure.  Just briefly, Your Honor.

16                    REDIRECT EXAMINATION

17   BY MR. KOPCZYNSKI:

18   Q    So, Deputy Chambers, you were asked a lot about lighting.

19   Was there enough ambient light out there that you think someone

20   could fish around in the rocks?

21        MR. CANTOR:  I'm going to object to that, Your Honor.

22   That calls for speculation.

23        THE COURT:  The objection to the form of the question

24   will be sustained.

25        MR. KOPCZYNSKI:  Okay.  Sure.  Let me rephrase that.

1  Q   Deputy Chambers, how would you describe the ambient lighting

2  out there on the tracks that night?

3  A   The moon was up.  I remember that there was some ambient

4  lighting, yes.

5  Q   Okay.  So you were asked a question about sources of light.

6  If someone was looking for something down on the tracks among the

7  rocks, like a wire or keys, in your judgment, based on your

8  observations of the light that night, would someone have wanted a

9  source of light, like a flashlight?

10         MR. CANTOR:  I'm going to object.  That calls for

11  speculation as well.

12         THE COURT:  Sustained.

13  Q   Was there a point where you were able to move about on the

14  tracks without any artifical source of light?

15  A   Yes.  I walked to and from my vehicle to where the shunt was

16  without my flashlight multiple times.

17  Q   And were you stumbling around, tripping over your feet?

18  A   No.

19  Q   Okay.  I will leave it there.

20         MR. KOPCZYNSKI:  Thank you, Deputy.

21         THE WITNESS:  Yes.

22         THE COURT:  Deputy, thank you.

23         THE WITNESS:  Thank you.

24         THE COURT:  You may step down.  You are free to go.

25         THE WITNESS:  Thank you.

 1          THE COURT:  The government may call their next witness.

 2          MS. JIANG:  The government calls Stanley Austin

 3   Streubel.

 4          THE COURT:  Officer, good morning.  If I could have you

 5   work your way through the well of the courtroom, come up in front

 6   of my clerk, raise your right hand to be sworn prior to

 7   testifying.

 8                       STANLEY A. STREUBEL,

 9        having been sworn under oath, testified as follows:

10          THE WITNESS:  Yes, I do.

11          THE CLERK:  Thank you.  Please have a seat.

12          THE WITNESS:  Good morning.

13          THE CLERK:  Could you please state your name for the

14   record and spell your last name for our court reporter?

15          THE WITNESS:  Yes.  My name is Stanley Austin Streubel,

16   S-t-r-e-u-b-e-l.

17          THE COURT:  And, Officer, we're asking that if witnesses

18   are comfortable removing your mask while you testify, you may do

19   so.  Please listen carefully to the questions asked.  Do your

20   best to answer that question.  Don't speak over counsel because

21   it's impossible for our court reporter to follow.  And if you

22   don't understand something, just say so; we will try to get

23   counsel to clarify.

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  You may inquire, Ms. Jiang.

1        MS. JIANG:  Thank you, Your Honor.

2                      DIRECT EXAMINATION

3  BY MS. JIANG:

4  Q    Good morning, sir.

5  A    Good morning.

6  Q    Where do you presently work?

7  A    I'm currently employed as a deputy sheriff with the Whatcom

8  County Sheriff's Office.

9  Q    How long have you been at the sheriff's office?

10  A    I have worked at the sheriff's office since February of 2004,

11  and I have been in law enforcement since January of 2001.

12  Q    So you have been in law enforcement for about two decades; is

13  that correct?

14  A    Twenty years, yes.

15  Q    Could you tell us a bit about your training, please?

16  A    Our training begins at the basic law enforcement academy,

17  just shy of six months -- or four months, sorry, four months of

18  initial training.  After that, you go to your agency, which

19  whichever agency you were hired with, for additional training,

20  and then you complete a field training assignment, generally

21  about three months long, where you are paired with other officers

22  who train you how to do the job.

23        After I completed that training with my first agency, I

24  transferred to the Whatcom County Sheriff's Office where I

25  completed additional training and an additional field training; I

1    believe it was about two months long.

2        Since then, I've attended numerous different trainings for my

3    assignments.  I have been a neighborhood deputy, I have been a

4    field training officer, I have been assigned to the SWAT team

5    since 2004 -- or, excuse me, since 2005.  Currently, I am

6    assigned to the K-9 Unit.  I have been assigned there for eight

7    years.  I have also been a drug recognition expert and had

8    advanced training on DUI impairments.  We go through annual

9    training now on crisis response and responding to people who are

10   in crisis, lots of first-aid training.

11       That's it in a nutshell.  There's a lot of training.

12   Q   You mentioned that you currently work with a K-9 partner.

13   Was that true in November of 2020?

14   A   It was.  I was assigned to my partner K-9 Jag, but he is now

15   retired.  He retired last month, and I'm training with a new

16   partner.

17   Q   During November of 2020, did you have a human partner?

18   A   I did not.

19   Q   What was your typical shift in terms of hours in November

20   of 2020?

21   A   During that time, I was working 7:00 p.m. to 4:00 a.m., and I

22   either worked Wednesday through Saturday or Sunday through

23   Wednesday, and I rotate every two months.

24   Q   Could you briefly describe what your duties were in November

25   of 2020?

1   A    My duties assigned to the K-9 Units are to support the patrol

2   division.  So I have all the duties of a patrol deputy handling

3   911 calls, traffic enforcement, anything that may come up for

4   active patrol, as well as assisting patrol or detectives or other

5   agencies with my K-9 partner either searching for people,

6   evidence, or narcotics.

7   Q    During that time period, was there a specific sector that you

8   worked?

9   A    I am not assigned a specific sector in my county.  I can

10  patrol anywhere I need to.  Generally, I patrol on the west side

11  of our county, specifically the southwest side of our county,

12  kind of south of Ferndale, if anybody is familiar with that, and

13  north of Bellingham.

14  Q    On the night of November 28th of last year, did you respond

15  to a call?

16  A    I did, just before 11:30 in the evening.

17  Q    What was the nature of the call?

18  A    Burlington Northern had called our dispatch center requesting

19  deputies respond to the area of the railroad tracks near

20  Cliffside Drive.  They reported having a couple of people on

21  camera trespassing on the railroad tracks.  They requested a

22  respond to try and contact them.

23  Q    The area near Cliffside Drive, are you familiar with that

24  area as part of your patrol?

25  A    Yes, I am.  It is in the area that I described as being

1   south of Ferndale or north of Bellingham.

2   Q   Did you coordinate your response with any of your colleagues?

3   A   Yes.  Initially, it was Deputy Chambers and I who were

4   assigned to respond to the call.  And the coordination was that I

5   went to the location south of Cliffside Drive, it's Locust

6   Avenue.  I believe the two people were walking south from

7   Cliffside Drive.  I thought if I walked north, I might encounter

8   them.  So I responded there, and Deputy Chambers responded to

9   Cliffside Drive.

10  Q   I'm going to show you a map that has been admitted into

11  evidence.  It's Exhibit 33.  I'm having some tech issues, so I

12  guess -- There we go.  I'm publishing it now for the jury.

13      Sir, do you recognize this map?

14  A   I do.  It's a little small, but I recognize the area, yes.

15  Q   Here, let me zoom in a little bit.  I think you can mark on

16  the screen.

17      Could you just mark for us the area, I guess, where you

18  initially responded?

19  A   Where I initially responded was this area right here, and

20  then I walked generally north along the railroad tracks from

21  there.

22  Q   Okay.  I guess that gray squiggly line, what is that?  A poor

23  question.  I'm sorry.

24  A   It looks blue.

25  Q   Blue, yes.

1        Where was this line?  And what is that?

2    A    Those are the railroad tracks.

3    Q    Okay.  And you mentioned that you didn't have a human

4    partner.  So where was Deputy Chambers initially responding to?

5    A    Deputy Chambers was responding to Cliffside Drive, which is

6    up here.

7    Q    Right.  Thank you.

8        And when you got to Locust Avenue, what did you do?

9    A    I got out -- parked my car, got out, began walking north on

10   the railroad tracks to see if I could locate the two people, and

11   as I walked, I would say about 200 yards north, I heard Deputy

12   Chambers radio that he had located two people somewhere north of

13   Cliffside Drive.

14   Q    What did you do next?

15   A    So I started returning to my car.  In that area of the

16   county, we have very poor radio reception, and dispatch was

17   trying to raise Deputy Chambers on the radio and could not, or

18   could not hear him, so then I ran back to my car to go up there

19   and assist him because I didn't know what was going on.

20   Q    Did you find Deputy Chambers and the two other individuals at

21   some point?

22   A    I did.  So when I arrived on Cliffside Drive, I parked behind

23   his marked car, and I didn't see him initially, but I walked to

24   the railroad tracks and looked north, and standing at the

25   railroad tracks, I could see him standing about 100 yards north

1    of Cliffside Drive on the tracks with two other figures.

2    Q    Did you later identify who the other two individuals were?

3    A    Yes, we did.

4    Q    Who were they?

5    A    One was identified as Samantha, or Sam, Brooks, and the other

6    one was Eileen Reiche.

7         I'm sorry.  Ellen.  Ellen Reiche.

8    Q    Do you see either of them in this courtroom?

9    A    I do see Ellen.

10   Q    Could you identify her based on what she's wearing?

11   A    I could.  She's sitting over here on the right side of the

12   courtroom with a gray-type shirt on.

13        MS. JIANG:  Your Honor, could the record reflect that

14   the defendant is identifying -- sorry, the witness is identifying

15   the defendant?

16        THE COURT:  The record will so reflect.

17        MS. JIANG:  Okay.

18   Q    How was the defendant dressed that night?

19   A    When I got up to where Deputy Chambers was at, I noticed that

20   both defendants -- or the defendant was wearing dark colored or

21   black clothing with fresh dirt on them.

22   Q    What about her companion, Sam Brooks?

23   A    The same.  Black-colored -- dark black-colored clothing with

24   fresh dirt on them.

25   Q    Was the defendant holding anything?

1    A    Yes.  It was a paper grocery bag.

2    Q    Once you arrived, did you and Deputy Chambers continue

3    speaking with them on the railroad tracks?

4    A    Yes.  Deputy Chambers primarily did most of the speaking with

5    them, as he was the primary deputy investigating it, but I also

6    contributed to the conversation at times.

7    Q    Did they explain why they were out there?

8    A    Yes.  They explained that they -- earlier they had been at a

9    park further north on the tracks that you can access from Marine

10   Drive and they had lost their house keys somewhere, so they were

11   back looking for those keys.

12   Q    Did either of them have any flashlights?

13   A    I did not see them with any flashlights.

14   Q    What about headlamps?

15   A    No.  No lights.

16   Q    No lights?

17   A    No lights.

18   Q    Did you offer to assist them with looking for keys?

19   A    We did.  We offered to help them look for their keys, and

20   they didn't seem interested in our help.

21   Q    How long were the four of you talking on the tracks after you

22   arrived?

23   A    On the tracks, I would estimate over five minutes, before we

24   moved back down to where our patrol cars were parked.

25   Q    At some point did other officers arrive?

1    A    That is correct.

2    Q    What happened after they arrived?

3    A    An agent with the Burlington Northern Santa Fe Police arrived

4    and an FBI agent also arrived.  After they arrived, I stayed with

5    Ellen and Sam while Deputy Chambers spoke with the FBI agent and

6    then walked down the tracks to look for something.

7         When he returned, he noted that he had found something on the

8    tracks that's commonly called a shunt, and there was also some

9    conversation about a backpack that they were believed to have in

10   their possession on camera, so they asked me if I would go down

11   and look for -- look through the bushes to see if they had thrown

12   a backpack or dropped a backpack somewhere.

13   Q    Was there a backpack?

14   A    I did not find a backpack.  I did see what they were

15   describing as the shunt on the railroad tracks.  I didn't locate

16   any other evidence or anything down the tracks or in the bushes.

17   Q    What happened after the shunt was found?

18   A    After the shunt was found, it was determined that the two

19   would be arrested, and I don't remember the exact RCW, the

20   Revised Code of Washington law, that they were arrested under.

21   It was tampering with railroad tracks.  And Deputy Chambers took

22   Ms. Brooks into custody, and I placed Ellen into handcuffs.

23   Q    Did you search her as part of the arrest?

24   A    I did.  And as part of the arrest, I don't remember, I either

25   took the bag from her, the grocery bag and set it down, or I

1   asked her to set it down on the ground.  After placing her in

2   handcuffs, I then walked her a short distance over to the front

3   of Deputy Chambers' patrol car where I then searched her.

4   Q    That search, was it part of your lawful authority?

5   A    Yes.  Any time somebody is arrested, any bag, purse, backpack

6   in their possession gets searched prior to them being booked into

7   jail, and then their person also gets searched for any evidence

8   or weapons before they're booked into jail.

9   Q    On her person when you searched her, did you find anything?

10  A    Nothing that I noted of evidentiary value.  She had some

11  items in her pocket.

12  Q    What items were those?

13  A    I would have to refer to my report to tell you exactly what

14  they were.

15  Q    Okay.  Your "report," are you referring to your sheriff's

16  report?

17  A    Yes.

18      Any time you are involved with an incident, they require a

19  report.  You either have to write the primary report or a

20  supplemental report to the primary deputy's report.  In this

21  case, I wrote a supplementary report.

22  Q    Okay.

23  A    And if I could just clarify, the items that I took off of her

24  person, out of her pockets, I don't recall.  That's what I have

25  to refer to the report for.  I do recall what I saw in the bag.

1    Q   Okay.  So let's talk about the bag.  You mentioned that -- I

2    guess, what happened to the paper bag?

3    A   So, initially, when I told her that she would be placed under

4    arrest, again, I either took the bag from her and set it down on

5    the ground, or I asked her to set it down, which I commonly do,

6    have them set items down, so then I could handcuff them and their

7    hands are free.

8        When it was set down on the ground, it was set at her feet.

9    Again, it was a paper grocery bag with two handles.  And when it

10   was set down, it was partially open.  Inside I noted that I could

11   see an electric drill with a wire brush on it and a wire.

12   Q   Up until the point that you arrested her, was she holding the

13   paper bag the entire point?

14   A   Yes, she was.

15   Q   One second.

16       I'm going to show you what has previously been admitted as

17   Exhibit 24.  What are we looking at here?

18   A   So this is the paper bag that Ellen was holding.  In this

19   picture, it is open further than when we first set it down

20   because this is being held open for a picture.  But that is the

21   drill with the wire brush on it and the wire that I could see

22   when it was set down.

23   Q   Is this picture a fair and accurate depiction of the contents

24   of the bag that night?

25   A   Yes, I would say it is.

1  Q   Okay.  So let's just return back to the search of her person

2  after the arrest.  You mentioned that it would refresh your

3  recollection to look at your report; is that correct?

4  A   That is correct.

5  Q   Okay.  So I'm not going to show this to the jury, but I am

6  going to pull up Exhibit 9, at page 10.  Let me know if this

7  helps refresh your recollection about what you found on her

8  person.

9  A   It does, yes.

10 Q   Could you tell the jury what you found on her person?

11 A   Yeah.  She had a set of keys, some earbuds, a lighter, and

12 then a receipt.

13 Q   Okay.

14        MS. JIANG:  No further questions, Your Honor.

15        THE COURT:  Cross-examination, Mr. Cantor.

16                    CROSS-EXAMINATION

17 BY MR. CANTOR:

18 Q   This is not going to take very long.  And good afternoon.

19 Or, no, good morning.

20 A   Good morning, sir.

21 Q   We're almost there.

22     When you arrived at the Cliffside crossing, that's when

23 Deputy Chambers was already in contact with the two individuals,

24 right?

25 A   That is correct.

1  Q   And at this point in time when you approached Deputy

2  Chambers, is it fair to say that his spotlight or his floodlight

3  from his vehicle was shining right on that area?

4  A   I don't know that it was his floodlight.  I don't think it

5  would have reached that far.  But he had a flashlight.  We all

6  carry flashlights.

7  Q   Okay.  All right.  So it was well illuminated from these

8  lights that you guys were carrying?

9  A   Yes, I would say so.

10 Q   And just to get back to the weather at the time, I mean, it

11 was cold that night, right?

12 A   It was cold.  I remember it being fairly cold, yes.

13 Q   Like around freezing temperature, like 32 degrees?

14 A   It could be, yeah.  It was cold, I remember that.

15 Q   So it would not be unusual for these two individuals to be

16 wearing, like, heavy coats, for example?

17 A   No.  In fact, we probably were as well.

18 Q   All right.  You would agree that they were wearing winter

19 clothing, correct?

20 A   Yes.

21 Q   All right.  The keys and the lighter, the earbuds that you

22 said you collected, where are they?

23 A   I don't know.  They would have gone with her to jail and,

24 other than the lighter, which we cannot book into the jail,

25 should have been placed in her property box or taken for

1  evidence.  But I didn't handle that, so I don't know.

2  Q   So as far as you know, they were never placed in evidence,

3  were they?

4  A   I have no idea.

5  Q   All right.  If they were placed in evidence, we would all see

6  them, correct?

7  A   Correct.

8  Q   Okay.  Thank you.

9          MR. CANTOR:  No further questions.

10          MS. JIANG:  Nothing further, Your Honor.

11          THE COURT:  Officer, thank you.  You may step down.  You

12  are free to go.

13          THE WITNESS:  Thank you, Your Honor.

14          THE COURT:  And the government may call their next

15  witness.

16          MR. KOPCZYNSKI:  Your Honor, the government rests.

17          THE COURT:  Mr. Cantor, we're just a few minutes before

18  the lunch break.  The government has rested.  I don't know if at

19  this point in time, counsel, if you intend to call any witnesses

20  or not.

21          MR. CANTOR:  Well, with the Court's permission, Your

22  Honor, if we can take our lunch break now, and then we're

23  prepared to come ten minutes early, if the Court wants us to, but

24  we will have that decision about whether we will call witnesses

25  or rest at the conclusion of the lunch break, if the Court wants.

1            THE COURT:  All right.

2            MR. CANTOR:  Since we're so close to the lunch hour.

3            THE COURT:  Yes, that's fine.

4      So, ladies and gentlemen, as far as you're concerned, we're

5  going to go ahead and take our lunch break at this point in time.

6  By that clock on the wall, it's about ten minutes or so before

7  noon.  If I could have you all ready to come right back in here

8  say at one o'clock, and that will give us a little bit of time to

9  meet with counsel and see what the next step is going to be.  So

10 either there will be testimony put on this afternoon or, if both

11 sides rest, then we go to reading the instructions of law to you

12 and then you would begin your deliberations, all right?

13      So, Madam Clerk, has the lunch arrived?

14            THE CLERK:  It should be here in the next ten minutes.

15            THE COURT:  All right.  Then you are free to go to Judge

16 Jones' courtroom.  Have a good lunch.

17      (The following occurred outside the presence of the jury.)

18            THE COURT:  All right.  You may all be seated.

19      Counsel, for our purposes, in terms of preparing the jury

20 instructions, do you know at this point in time whether or not

21 you are going to call any witnesses?

22            MR. CANTOR:  No.  I just want to confirm that with the

23 team.  Ms. Reiche has decided she's not going to testify.  I have

24 advised her of her right to testify, and she is, as far as I

25 understand, electing not to.

1    We have pretty much made a decision that we're not going to

2    call Agent Kauffman, but I want to discuss it with the team one

3    more time over the lunch hour.  But, realistically, we will be

4    resting.

5         THE COURT:  All right.  It will take us a few minutes to

6    prepare the instructions and copy them all for the jurors.  So

7    it's time for formal exceptions, I guess.  I believe my clerk has

8    handed to you copies of the proposed instructions of the Court,

9    and I don't know if you have had a chance to take a look at them

10   at all.

11        MR. KOPCZYNSKI:  For the government, we have, Your

12   Honor, and we have no objection to the verdict form and the

13   instructions.

14        THE COURT:  Thank you.  We did make the changes to the

15   verdict formed as proposed by both sides.

16        MR. CANTOR:  Yes.  And as for the defense, I do see that

17   the Court has included the "mere presence" instruction as part of

18   the aiding and abetting and the actual offense, the to-convict

19   instruction, I think that's 12 and 13.  So we have no objection

20   to that.

21        And Instruction 3, we will just modify that, where the

22   defendant in a criminal case has a constitutional right not to

23   testify.

24        And we are in agreement with the verdict form.  I think we're

25   all on the same page.

```
 1              THE COURT:  All right.  Great.  Thank you.
 2        Then let's plan on being back here exactly at one o'clock.
 3   The Court will be prepared at that point in time to indicate to
 4   the jury that both sides have -- well, I will ask you to rest on
 5   the record, and then at that point in time we will be ready to
 6   hand out the instructions and go right into closings, all right?
 7        Have a good lunch.  We will be at recess.
 8                          (Recessed.)
 9      (The following occurred outside the presence of the jury.)
10              THE COURT:  All right.  Thank you.
11        Counsel, are we ready for our jurors?
12              MR. KOPCZYNSKI:  Yes, Your Honor.
13              THE COURT:  We have the instructions all ready to go.
14   We will bring them in.  Mr. Cantor, I will ask you to rest on the
15   record, we will hand out the instructions, and then we will go
16   right into closing.
17              MR. CANTOR:  Okay.  Mr. Sanders will be doing the
18   closing.
19              THE COURT:  Thank you.
20       (The following occurred in the presence of the jury.)
21              THE COURT:  And you may all be seated.  Thank you.
22        Good afternoon, ladies and gentlemen.  Welcome back.
23        Mr. Cantor, does the defense intend to call any witnesses?
24              MR. CANTOR:  The defense rests.  Thank you.
25              THE COURT:  Folks, you have heard that both sides have
```

1   rested.  That's all the evidence you will get.  The case is still

2   not to you at this point in time because, as I told you at the

3   beginning, the next step is for the Court to formally give you

4   instructions of law.

5       The law requires the Court read those instructions to you.

6   In the old days, literally, we would read the packet of

7   instructions and give you one copy and send you back to the jury

8   room.  It never made any sense to me because then you would have

9   to pass that thing around the whole time so everybody could read

10  it.  So we will make copies for all of you, and my clerk will

11  hand them out to you, and you can follow along with me as I read

12  them.  The only caveat is that this is the original.  If there

13  are any changes that are made on this one, this is the one that

14  controls, all right?

15      And this way, with your own copies, you don't have to hand

16  them back and forth, so there's less -- yes, exactly.

17      So if you would please turn to Instruction No. 1 and follow

18  along as I read.

19      Members of the jury, now that you have heard all the

20  evidence, it is my duty to instruct you on the law that applies

21  to this case.  A copy of these instructions will be available in

22  the jury room for you to consult.

23      It is your duty to weigh and evaluate all the evidence

24  received in the case and, in that process, decide the facts.  It

25  is also your duty to apply the law, as I give it to you, to the

1   facts as you find them, whether you agree with the law or not.

2   You must decide the case solely on the evidence and the law.

3       Do not allow personal likes or dislikes, sympathy, prejudice,

4   fear, or public opinion to influence you.  You should also not be

5   influenced by any person's race, color, religion, national

6   ancestry, gender, sexual orientation, profession, occupation,

7   celebrity, economic circumstances, or position in life or in the

8   community.  You will recall you took an oath promising to do so

9   at the beginning of the case.  You must follow all of these

10  instructions and not single out some and ignore others.  They are

11  all important.  Please do not read into these instructions or

12  into anything I may have said or done any suggestion as to what

13  verdict you should return.  That is a matter entirely up to you.

14      Number 2:  The indictment is not evidence.  The defendant has

15  pled not guilty to the charges.  The defendant is presumed to be

16  innocent unless and until the government proves the defendant

17  guilty beyond a reasonable doubt.

18      In addition, the defendant does not have to testify or

19  present any evidence.  The defendant does not have to prove

20  innocence.  The government has the burden of proving every

21  element of the charges beyond a reasonable doubt.

22      Number 3:  A defendant in a criminal case has a

23  constitutional right not to testify.  In arriving at your

24  verdict, the law prohibits you from considering in any manner

25  that the defendant did not testify.

1      Number 4:  Proof beyond a reasonable doubt is proof that

2   leaves you firmly convinced that the defendant is guilty.  It is

3   not required that the government prove guilt beyond all possible

4   doubt.  A reasonable doubt is a doubt based upon reason and

5   common sense.  It is not based purely on speculation.  It may

6   arise from a careful and impartial consideration of all the

7   evidence or from lack of evidence.  If, after a careful and

8   impartial consideration of all the evidence, you are not

9   convinced beyond a reasonable doubt that the defendant is guilty,

10   it is your duty to find the defendant not guilty.  On the other

11   hand, if after a careful and impartial consideration of all the

12   evidence, you are convinced beyond a reasonable doubt that the

13   defendant is guilty, it is your duty to find the defendant

14   guilty.

15      Number 5:  The evidence you are to consider in deciding what

16   the facts are consists of the following three things:  one, the

17   sworn testimony of any witness; two, the exhibits received in

18   evidence; and, three, any facts to which the parties have agreed.

19      Number 6:  In reaching your verdict, you may consider only

20   the testimony and exhibits received in evidence.  The following

21   things are not evidence and you may not consider them in deciding

22   what the facts are:  One, questions, statements, objections, and

23   arguments by the lawyers are not evidence.  The lawyers are not

24   witnesses.  Also, you must consider a lawyer's questions to

25   understand the answers of a witness.  The lawyers' questions are

1   not evidence.  Similarly, what the lawyers have said in their

2   opening statements, will say in their closing arguments, and at

3   other times is intended to help you interpret the evidence, but

4   it is not evidence.  If the facts as you remember them differ

5   from the way the lawyers state them, your memory of them

6   controls.

7        Two, any testimony that I have excluded, stricken, or

8   instructed you to disregard is not evidence.  In addition, some

9   evidence was received only for a limited purpose.  When I have

10  instructed you to consider certain evidence in a limited way, you

11  must do so.

12       Three, anything you may have seen or heard when the court was

13  not in session is not evidence.  You are to decide the case

14  solely on the evidence received at the trial.

15       Number 7:  Evidence may be direct or circumstantial.  Direct

16  evidence is direct proof of a fact, such as testimony by a

17  witness about what that witness personally saw or heard or did.

18  Circumstantial evidence is indirect evidence, that is, it is

19  proof of one or more facts from which you can find another fact.

20       You are to consider both direct and circumstantial evidence.

21  Either can be used to prove any fact.  The law makes no

22  distinction between the weight to be given to either direct or

23  circumstantial evidence.  It is for you to decide how much weight

24  to give to any evidence.

25       Number 8:  In deciding the facts in this case, you may have

1  to decide which testimony to believe and which testimony not to

2  believe.  You may believe everything a witness says or a part of

3  it or none of it.

4      In considering the testimony of any witness, you may take

5  into account, one, the opportunity and ability of the witness to

6  see or hear or know the things testified to; two, the witness's

7  memory; three, the witness's manner while testifying; four, the

8  witness's interest in the outcome of the case, if any; five, the

9  witness's bias or prejudice, if any; six, whether other evidence

10  contradicted the witness's testimony; seven, the reasonableness

11  of the witness's testimony in light of all the evidence; and,

12  eight, any other factors that bear on believability.

13      Sometimes a witness may say something that is not consistent

14  with something else he or she said.  Sometimes different

15  witnesses will give different versions of what happened.  People

16  often forget things or make mistakes in what they remember.

17  Also, two people may see the same event but remember it

18  differently.  You may consider these differences, but do not

19  decide that testimony is untrue just because it differs from

20  other testimony.  However, if you decide that a witness has

21  deliberately testified untruthfully about something important,

22  you may choose not to believe anything that witness said.  On the

23  other hand, if you think the witness testified untruthfully about

24  some things but told the truth about others, you may accept the

25  part that you think is true and ignore the rest.  The weight of

1    the evidence as to a fact does not necessarily depend on the

2    number of witnesses who testify.  What is important is how

3    believable the witnesses were and how much weight you think their

4    testimony deserves.

5        Number 9:  You are here only to determine whether the

6    defendant is guilty or not guilty of the charge in the

7    indictment.  The defendant is not on trial for any conduct or

8    offense not charged in the indictment.

9        Number 10:  The indictment charges that the offenses alleged

10   were committed on or about a certain date.  Also, it is necessary

11   for the government to prove beyond a reasonable doubt that the

12   offenses were committed on a date reasonably near the date

13   alleged in the indictment.  It is not necessary for the

14   government to prove that the offense was committed precisely on

15   the date charged.

16       Number 11:  You have heard testimony that the defendant made

17   a statement.  It is for you to decide, one, whether the defendant

18   made the statement, and, two, if so, how much weight to give to

19   it.  In making those decisions, you should consider all the

20   evidence about the statement, including the circumstances under

21   which the defendant may have made it.

22       Number 12:  You have heard testimony from Eric S. Shaffstall

23   who testified to opinions and the reasons for his opinions.  This

24   opinion testimony is allowed because of the education or

25   experience of this witness.  Such opinion testimony should be

1  judged like any other testimony.  You may accept it or reject it

2  and give it as much weight as you think it deserves, considering

3  the witness's education and experience, the reasons given for the

4  opinion, and all the other evidence in the case.

5      Number 13:  The defendant is charged in Count 1 of the

6  indictment with violence against railroad carriers, in violation

7  of Title 18, United States Code, Sections 1992(a)(5),

8  1992(a)(10), 1992(c)(1), and 2.

9      In order for the defendant to be found guilty of that charge,

10  the government must prove each of the following elements beyond a

11  reasonable doubt:  one, first, the defendant knowingly impaired

12  the operation of a railroad signal system; two, second, the

13  defendant did so without lawful authority or permission; and,

14  three, finally, the conduct was against and affecting a railroad

15  carrier engaged in interstate or foreign commerce.

16      Mere presence at the scene of the crime or mere knowledge

17  that a crime is being committed is not sufficient to establish

18  that the defendant committed the crime of violence against a

19  railroad.  The defendant must be a participant and not merely a

20  knowing spectator.  The defendant's presence may be considered by

21  the jury along with other evidence in the case.

22      Number 14:  The defendant may be found guilty of violence

23  against railroad carriers even if the defendant personally did

24  not commit the act or acts constituting the crime but aided and

25  abetted in its commission.  To aid and abet means intentionally

1  to help someone else commit a crime.

2      To prove the defendant guilty of violence against railroad

3  carriers by aiding and abetting, the government must prove each

4  of the following beyond a reasonable doubt:  first, someone else

5  committed violence against railroad carriers; second, the

6  defendant aided, counseled, commanded, induced, or procured that

7  person with respect to at least one element of the crime; third,

8  the defendant acted with the intent to facilitate the crime; and,

9  fourth, the defendant acted before the crime was completed.

10     It is not enough that the defendant merely associated with

11 the person committing the crime or unknowingly or unintentionally

12 did things that were helpful to that person or was present at the

13 scene of the crime.  The evidence must show beyond a reasonable

14 doubt that the defendant acted with the knowledge and intention

15 of helping that person commit violence against railroad carriers.

16     A defendant acts with the intent to facilitate the crime when

17 the defendant actively participates in a criminal venture with

18 advance knowledge of that crime.  The government is not required

19 to prove precisely which defendant actually committed the crime

20 and which defendant aided and abetted.

21     Instruction 15:  The crime charged in Count 1 is also charged

22 as an attempt.  You may find the defendant guilty of Count 1 if

23 you find that she attempted to commit violence against railroad

24 carriers.  In order for the defendant to be found in attempting

25 that charge, the government must prove each of the following

1  elements beyond a reasonable doubt:  First, the defendant

2  intended to commit violence against railroad carriers.  I

3  previously instructed you on the elements of that crime.  Second,

4  the defendant did something that was a substantial step towards

5  committing that crime and that strongly corroborated the

6  defendant's intent to commit the crime.  Mere preparation is not

7  a substantial step towards committing the crime.

8      To constitute a substantial step, the defendant's act or

9  actions must unequivocally demonstrate that the crime will take

10 place unless interrupted by independent circumstances.

11     Jurors do not need to agree unanimously as to which

12 particular act or actions constitute a substantial step toward

13 the commission of a crime.

14     Instruction 16:  The crime charged in Count 1 is also charged

15 as a conspiracy.  In order for the defendant to be found guilty

16 of conspiring to commit violence against railroad carriers, the

17 government must prove each of the following elements beyond a

18 reasonable doubt:  first, on or about November 28th, 2020, there

19 was an agreement between two or more persons to commit violence

20 against railroad carriers as charged in that indictment, and,

21 second, the defendant became a member of that conspiracy knowing

22 of its object and intending to help accomplish it.

23     A conspiracy is kind of a criminal partnership, an agreement

24 of two or more people to commit one or more crimes.  A crime of

25 conspiracy is the agreement to do something unlawful.  It does

1    not matter whether the crime agreed upon was committed.  For a

2    conspiracy to have existed, it is not necessary that the

3    conspirators made a formal agreement or that they agreed on every

4    detail of the conspiracy.  It is not enough, however, that they

5    simply met, discussed matters of common interest, acted in

6    similar ways, or perhaps helped one another.  You must find that

7    there was a plan to commit violence against railroad carriers.

8    One becomes a member of a conspiracy by willfully participating

9    in the unlawful plan with the intent to advance or further some

10   object or purpose of the conspiracy, even though the person does

11   not have full knowledge of all the details of the conspiracy.

12   Furthermore, one who willfully joins an existing conspiracy is as

13   responsible for it as the originators.  On the other hand, one

14   who has no knowledge of the conspiracy but happens to act in a

15   way which furthers some object or purpose of the conspiracy does

16   not thereby become a conspirator.  Similarly, a person does not

17   become a conspirator merely by associating with one or more

18   persons who are conspirators, not merely by knowing that a

19   conspiracy exists.

20       Number 17:  A conspiracy may continue for a long period of

21   time.  It may include the performance of many transactions.  It

22   is not necessary that all members of the conspiracy join in at

23   the same time.  And one may become a member of a conspiracy

24   without full knowledge of all the details of the unlawful scheme

25   or the names, identities, or locations of all the other members.

1       Even though a defendant did not directly conspire with other

2   conspirators in the overall scheme, the defendant has, in effect,

3   agreed to participate in the conspiracy if the government proves

4   each of the following beyond a reasonable doubt:  first, that the

5   defendant directly conspired with one or more conspirators to

6   carry out at least one of the objects of the conspiracy; second,

7   that the defendant knew or had reason to know that other

8   conspirators were involved with those with whom the defendant

9   directly conspired; and, third, that the defendant had reason to

10  believe that whatever benefits the defendant might get from the

11  conspiracy were probably dependent upon the success of the entire

12  venture.

13      It is not a defense that a person's participation in the

14  conspiracy was minor or for a short period of time.

15      Number 18:  An act is done knowingly if the defendant is

16  aware of the act and does not act through ignorance, mistake, or

17  accident.  The government is not required to prove the defendant

18  knew that her acts or omissions were unlawful.  You may consider

19  evidence of the defendant's words, acts, or omissions, along with

20  all the other evidence, in deciding whether the defendant acted

21  knowingly.

22      Number 19:  When you begin your deliberations, elect one

23  member of the jury as your presiding juror who will preside over

24  the deliberations and speak for you here in court.  You will then

25  discuss the case with your fellow jurors to reach agreement, if

1    you can do so.  Your verdict, whether guilty or not guilty, must

2    be unanimous.  Each of you must decide the case for yourself, but

3    you should do so only after you have considered all the evidence,

4    discussed it fully with the other jurors, and listened to the

5    views of your fellow jurors.  Do not be afraid to change your

6    opinion if the discussion persuades you that you should, but do

7    not come to a decision simply because other jurors think it is

8    right.

9         It's important that you attempt to reach a unanimous verdict,

10   but, of course, only if each of you can do so after having made

11   your own conscientious decision.  Do not change an honest belief

12   about the weight and effect of the evidence simply to reach a

13   verdict.

14        Perform these duties fairly and impartially.  Do not allow

15   personal likes, dislikes, sympathy, prejudice, fear or public

16   opinion to influence you.  You should also not be influenced by

17   any person's race, color, religion, ancestry, gender, sexual

18   orientation, profession, occupation, celebrity, economic

19   circumstances or position in life or in the community.

20        It is your duty as jurors to consult with one another and to

21   deliberate with one another with a view towards reaching an

22   agreement, if you can do so.

23        During your deliberations, you should not hesitate to

24   re-examine your own views and change your opinion if you become

25   persuaded that it is wrong.

 1          Number 20:  Because you must base your verdict on the

 2    evidence received in the case and on these instructions, I will

 3    remind you, you must not be exposed to any other information

 4    about the case or to the issues it involves.  Except for

 5    discussing the case with your fellow jurors during your

 6    deliberations, do not communicate with anyone in any way.  Do not

 7    let anyone else communicate with you in any way about the merits

 8    of the case or anything to do with it.  This includes discussing

 9    the case in person, in writing, by phone or electronic means, via

10    e-mail, text messaging, or any Internet chat room, blog, website,

11    or any other forms of social media.  This restriction applies to

12    communicating with your family members, employers, the media or

13    press, and the people involved in the trial.

14          If you are asked or approached in any way about your jury

15    service or anything about this case, you must respond you have

16    been ordered not to discuss the matter and report that contact to

17    the Court.

18          Do not read, watch, or listen to any news or media accounts

19    or commentary about this case or anything to do with it.  Do not

20    do any research such as consulting dictionaries, searching the

21    Internet, or using other reference materials.  Do not make any

22    investigation in any other way or in any other way try to learn

23    about the case on your own.

24          The law requires these restrictions to ensure the parties

25    have a fair trial based on the evidence that each party has had

1   an opportunity to address.  A juror who violates these

2   restrictions jeopardizes the fairness of these proceedings and a

3   mistrial could result that would require the entire trial process

4   to start over.  If any juror is exposed to any outside

5   information, please notify the Court immediately.

6       Instruction 21:  Some of you have taken notes during the

7   trial.  Whether or not you took notes, you should rely on your

8   own memory of what was said.  Notes are only there to assist your

9   memory.  You should not be overly influenced by your notes or

10  those of your fellow jurors.

11      Instruction 22:  The punishment provided by law for this

12  crime is for the Court to decide.  You may not consider

13  punishment in deciding whether the government has proved its case

14  against a defendant beyond a reasonable doubt.

15      Instruction 23:  I want to remind you about your duties as

16  jurors.  When you deliberate, it will be your duty to weigh and

17  to evaluate all the evidence received in the case, and in that

18  process, to decide the facts.  To the facts as you find them, you

19  will apply the law as I give it to you, whether you agree with

20  the law or not.  You must decide the case solely on the evidence

21  and the law before you.  Perform these duties fairly and

22  impartially.  You should not be influenced by any person's race,

23  color, religious beliefs, national ancestry, sexual orientation,

24  gender identity, gender, or economic circumstances.  Also, do not

25  allow yourself to be influenced by personal likes or dislikes,

1  sympathy, prejudice, fear, public opinion or biases, including

2  unconscious bias.

3      Unconscious biases are stereotypes, attitudes, or preferences

4  that people may consciously reject or may be expressed without

5  conscious awareness, control, or intention.  Like conscious bias,

6  unconscious bias can affect how we evaluate information and make

7  decisions.

8      Instruction 24:  A verdict form has been prepared for you.

9  After you have reached unanimous agreement on a verdict, your

10  foreperson should complete the verdict form according to your

11  deliberations, sign and date it, and advise the clerk you are

12  ready to return to the courtroom.

13      And, finally, 25:  If it becomes necessary during your

14  deliberations to communicate with me, you may send a note through

15  our clerk signed by any one or more of you.  No member of the

16  jury should ever attempt to communicate with me except by a

17  signed writing.  I will respond to the jury concerning the case

18  only in writing or here in open court.

19      If you send out a question, I will consult with the lawyers

20  before answering it, and that may take some time.  You may

21  continue your deliberations while waiting for the answer to any

22  question.  Remember, you are not to tell anyone, including me,

23  how the jury stands, numerically or otherwise, on any question

24  submitted to you, including the question of the guilt of the

25  defendant, until after you have reached a unanimous verdict or

1  have been discharged.

2      Ladies and gentlemen, that concludes the reading of the

3  Court's instructions.

4      Remember now, the final phase is for counsel to have an

5  opportunity to argue in what is appropriately termed "closing

6  argument," what they believe the evidence has, in fact, shown.

7      So, please, at this time, would you give your very kind

8  attention to the closing argument of the government.

9      Ms. Jiang.

10      MS. JIANG:  Thank you, Your Honor.

11      Ladies and gentlemen, this is a simple case.  The defendant

12  and her co-conspirator, working together, installed a shunt on a

13  railroad track near Bellingham.  The shunt disrupted the railroad

14  signal system that keeps trains from colliding into each other

15  and into cars.  That act of installing an unauthorized shunt is a

16  crime.

17      We're now at the end of this case, and you have heard from

18  the witnesses and reviewed the exhibits, and we commend you and

19  thank you for your careful attention during this proceeding.

20  Soon, you will go back to the jury room to deliberate.  But

21  before you do, I want to take a bit of time to review the

22  instructions and to show how the evidence proves each element of

23  the crime.

24      As the Court has instructed you, the crime of violence

25  against a railroad carrier has three elements.  First, the

1    defendant knowingly impaired the operation of a railroad signal

2    system; second, the defendant did so without lawful authority or

3    permission; and, finally, the conduct was against and affecting a

4    railroad carrier engaged in interstate or foreign commerce.

5        The government has the burden of proving each element beyond

6    a reasonable doubt, and we embrace that standard.  The second and

7    third elements are not in dispute, so let's start with those.

8        The second element is that the defendant acted without lawful

9    authority or permission.  You heard that the defendant is not a

10   BNSF employee and she had no authority to place a shunt on the

11   railroad.  That element is proven.

12       The next element is that the conduct was against and

13   affecting a railroad carrier engaged in interstate or foreign

14   commerce.  Interstate commerce means that a company engages in

15   commercial activity in at least two different states.  Foreign

16   commerce means that a company engages in commercial activity

17   outside the United States.

18       BNSF Deputy Chief Tyler Nies testified that BNSF is a railway

19   freight company whose business is to transport all sorts of

20   commodities and that it operates in numerous states and in

21   Canada, meaning that BNSF engages in both interstate and foreign

22   commerce.  This element has been proven.

23       That leads us to the last element, that the defendant

24   knowingly impaired the operation of a railroad signal system.

25   The evidence shows that the defendant and her co-conspirator

1   worked together as a team to place a shunt on the railroad in

2   order to disrupt the railroad signal system.

3       Let's take a look at the timeline.  Deputy Chief Nies

4   received an alert from a camera at 11:24 p.m.  Just under

5   20 minutes later, at 11:41 p.m., or as you can see from the

6   exhibit here, 1:41 Texas time, Deputy Chief Nies sees that the

7   tracks where the defendant is located turns red, indicating that

8   it's occupied even though there's no train in that area, meaning

9   the defendant's unauthorized shunt has worked; it's tricked the

10  system into thinking there is a train there.

11      A couple minutes later, at around 11:46 p.m., Deputy Chambers

12  spots the defendant and her co-conspirator crouched down on the

13  ground between the tracks.  The defendant and her co-conspirator

14  are both wearing black from head to toe and they both have fresh

15  dirt on their clothes.  Later, Deputy Chambers found the shunt

16  buried under rocks where he had seen the defendant crouched down

17  between the tracks.  The shunt stretched from one end to the

18  other end.  The defendant and her co-conspirator had used rocks

19  to bury the shunt to make it hard to detect.  Nevertheless,

20  Deputy Chambers was able to locate the shunt both because he had

21  caught the defendant in the act and because that area had freshly

22  moved dirt and no frost.  It was freezing that night, so when the

23  deputy was shining his light, he could see that there was frost

24  on the ground except for the area where the shunt was found.

25      You heard from Deputy Chambers and Deputy Streubel that the

1  defendant and her conspirator both lied about why they were out

2  there, saying they were looking for a set of keys that they lost.

3  But that's preposterous for a number of reasons.  First, it was

4  freezing out, 32 degree to be exact.  Second, it was the middle

5  of the night.  Third, the defendant and her co-conspirator had no

6  source of light to look for keys, yet they were out on the tracks

7  for about 20 minutes before the deputies caught them.  Fourth,

8  when the deputies offered to help look for the keys, they weren't

9  interested in their help.  Finally, when they were lawfully

10 searched incident to arrest, it turned out that they had keys in

11 their possession.

12      You also heard testimony that the defendant and her

13 co-conspirator both left their cell phones behind.  Their cell

14 phones weren't on their person and it wasn't in the vehicle that

15 they drove that night.  Ladies and gentlemen, you know why they

16 did that.  They were worried that law enforcement officers would

17 obtain a search warrant to track the location of their cell

18 phones and connect them to the crime scene.

19      The defendant lied about what was in the bag she was holding.

20 She claimed that it was Thanksgiving leftovers, but, actually, it

21 contained all the tools needed to install the shunt.  You heard

22 from Eric Shaffstall that the drill and wire brush were used to

23 clear rust from the rail in order to get a better connection for

24 the shunt.  You also heard that the rails where the shunt was

25 found was underneath, it was on the underside, and, typically,

1   there's rust there.  But where this shunt was found, it was

2   smooth.

3       You saw that the wires were somewhere -- the wires in the bag

4   were similar to the ones placed on the tracks.  The scissors and

5   the magnetic adhesive tape are both pretty obvious.  The tape was

6   to secure the shunt to the underside of the rails and the

7   scissors were to cut the tape.  The gloves are also obvious.  It

8   was to cover up their fingerprints.

9       You also heard what happens when someone interferes with a

10   signal system.  Just south of the shunt was a railroad crossing.

11   You heard testimony that, based on its location, the shunt

12   could have disrupted the railroad crossing such that cars driving

13   through it would not have had enough warning before a train

14   passed through.  In fact, given this shunt's location,

15   Mr. Shaffstall estimated that a train could have been at the

16   crossing before the first light came on, meaning a car driving

17   through would not have had any warning that a train was coming.

18       You also heard testimony that trains are very heavy, that

19   they are long, and that their weight may be unevenly distributed.

20   They aren't like cars that can stop relatively quickly.  In fact,

21   the average train takes about one to two miles to come to a safe

22   stop.  One to two miles.  Unexpected stops can lead to collisions

23   and derailments.

24       Deputy Chief Nies explained that this is a busy railroad line

25   and that the trains on it often carry hazardous materials.  This

1    danger isn't a hypothetical.  You heard that an unauthorized

2    shunt in October 2020 had, in fact, decoupled a train and that

3    this train was carrying hazardous materials.  You also heard that

4    on the night in question the next train was carrying

5    approximately 100 cars of crude oil.

6        All of this evidence makes clear that the defendant's

7    decision to disrupt the railroad signal system risks the safety

8    of not only the railroad engineer on the train but also of the

9    public.

10        In the defense's opening, they claimed the defendant didn't

11    commit a crime because there was no evidence that the defendant

12    placed the shunt on the railroad.  This is incorrect.  Putting

13    aside all of the evidence that I just discussed, which shows that

14    the defendant was caught red-handed, there are two ways that the

15    defendant, even if you believe she wasn't the one who actually

16    connected the shunt to the railroad tracks, is still guilty.

17    First, the Court provided you with instructions about aiding and

18    abetting.  That's legal jargon for intentionally helping someone

19    else commit a crime.  Here, the crime is placing an unauthorized

20    shunt that disrupted the railroad signal system.  As the Court's

21    aiding and abetting instruction makes clear, it doesn't matter

22    whether it was the defendant or her co-conspirator who ultimately

23    connected the shunt to the rail.  The Court is the source of the

24    law, and you must follow the Court's instructions.

25        The defendant is still guilty if she intentionally helped her

1    co-conspirator commit the crime.  All of the evidence that I have

2    just discussed shows that the defendant and her co-conspirator

3    acted together to place the shunt on the railroad tracks.

4    Second, as the Court has instructed you, you may also find the

5    defendant guilty if you find that she conspired to commit

6    violence against railroad carriers -- I'm sorry, conspiracy to

7    commit violence against railroad carriers.  Conspiracy is not

8    about doing something.  As you heard from the Court, what's

9    needed, what conspiracy criminalizes, is the agreement between

10   two or more co-conspirators to engage in illegal activity.  Here,

11   for all the reasons that I just discussed, the defendant and her

12   co-conspirator not only agreed, but they in fact acted together

13   to place a shunt on the railroad.

14       If you find that the defendant didn't actually succeed in

15   disrupting the railroad signal system, you may still find the

16   defendant guilty if you conclude she attempted to do so.  As the

17   Court has instructed, attempt does not require that the

18   defendant's action actually impair the operation of the railroad

19   signal system.  What matters is that she had the intent and she

20   took a substantial step, meaning she took action that was an

21   important step towards the completion of the crime.

22       Let me take a moment to discuss the verdict form that you

23   will need to fill out at the conclusion of your deliberation.

24       As to the first section, we ask that you find the defendant

25   guilty.  We also ask that you check all three ways that the

1   defendant committed the crime.  First, that she completed the

2   crime of violence against railroad carriers; second, that she

3   attempted to commit violence against railroad carriers; and,

4   finally, that she conspired with Sam Brooks, the other person

5   there that night, to commit violence against railroad carriers.

6        As you deliberate, review the Court's instructions and you

7   will see that this is a simple case about the defendant's

8   decision to install a shunt on the railroad in order to disrupt

9   the railroad signal system.  The defendant was caught with a bag

10  of tools used to scuff the rails and place the shunt.  That's

11  like being caught with a smoking gun.  Please use your common

12  sense, look at the evidence and the instructions, and you will

13  see that there's only one possible outcome.  Ladies and

14  gentlemen, the defendant must be held accountable for her

15  actions.  We ask that you find her guilty.

16        THE COURT:  Thank you very much, counsel.

17        Members of the jury, now please give that very same kind

18  attention to the closing of the defense by Mr. Sanders.

19        MR. SANDERS:  The government did not prove beyond a

20  reasonable doubt that Ellen Reiche knowingly impaired the

21  operation of the railroad signal system by placing the wire or

22  attempting to do so or making a conspiratorial agreement to do

23  so, aiding and abetting to do so.  That's what this case is

24  really about.  The government must prove that Ellen was involved

25  with this.

1          Now, my colleague, Jesse, at the beginning, he told you that

2     the government would spend a lot of time sort of talking about

3     what could happen if a shunt actually impairs a railroad signal

4     system, and so the electrical intricacies of this kind of system,

5     and we sure did spend a lot of time talking about that.  But the

6     government, they still have to prove that Ellen was involved with

7     this, and we will take some time to sort of unpack all of this.

8     But the thing is, as my colleague, Jesse, put it, Ellen may have

9     been guilty of trespassing; she is not guilty of violence against

10    railroad carriers.

11         Now, I think it's important to spend some time to speak or

12    talk about the burden of proof that the government has to meet,

13    and that's the beyond-a-reasonable-doubt standard.  Now, this is

14    a burden of proof that, in a legal profession, is actually the

15    highest burden of proof.  For lawsuits, when parties sue each

16    other, there's a lower burden of proof.  The plaintiff has to

17    prove beyond what is called a preponderance-of-the-evidence

18    standard.  That means the plaintiff has to prove its case such

19    that it is more likely or {sic} not or more probable than not.

20    That's the preponderance-of-the-evidence standard.

21         There's also the clear-and-convincing-evidence standard.

22    This is the standard that's used when the government wants to

23    terminate your rights to your children or perhaps remove you from

24    the United States in a deportation proceeding.  That's clear and

25    convincing evidence.

1      Beyond a reasonable doubt, that's the highest burden of

2   proof.  The government has to prove its case beyond a reasonable

3   doubt.  Now, what does that mean?  What does beyond a reasonable

4   doubt mean?  Now, we have some things to help us figure that out,

5   and that's the jury instruction.  I believe it's listed as Jury

6   Instruction 4.  And so Jury Instruction No. 4 reads -- I'm

7   actually just going to read from the packet here, although it's

8   also on the screen -- "Proof beyond a reasonable doubt is proof

9   that leaves you firmly convinced that the defendant is guilty.

10   It does not require that the government prove guilt beyond all

11   possible doubt.  A reasonable doubt is based upon reason and

12   common sense and is not based purely on speculation.  It may

13   arise from a careful and impartial consideration of all of the

14   evidence or from lack of evidence.  If after a careful and

15   impartial consideration of all of the evidence, you're not

16   convinced beyond a reasonable doubt that the defendant is guilty,

17   it is your duty to find the defendant not guilty.  On the other

18   hand, if after a careful and impartial consideration of all of

19   the evidence, you're convinced beyond a reasonable doubt that the

20   defendant is guilty, it is your duty to find the defendant

21   guilty."

22      So that gives us a little bit of a starting point, right?  It

23   seems like having a careful and impartial consideration of all of

24   the evidence, or from the lack of evidence, is pretty central to

25   this.  After you engage with that consideration, then you have to

1   evaluate the evidence and see does that really rise to the level

2   of beyond a reasonable doubt.

3       Now, in order to figure out sort of what, you know, gets us

4   to that high burden of proof of beyond a reasonable doubt, we

5   have a chart, and this is just one way to think about it.  At the

6   very top, you have the beyond a reasonable doubt, but you have

7   all of these other areas below that.  And, you know, perhaps we

8   can just start at the bottom.  It says "Proven not guilty."

9   Perhaps you have a case where there's 100 percent certainty that

10  the person is not guilty, proven not guilty, otherwise known as

11  innocent.  According to the jury instruction, in that case, it is

12  your duty to find that person not guilty.

13      We will move up a little bit.  We will go to "Possibly not,"

14  meaning they possibly didn't commit the crime; there were some

15  questions, but there were also some reasonable doubts.  According

16  to the jury instruction, in that case, it is still your duty to

17  find that person not guilty.

18      Even if we move up to "Guilt likely," in that case, according

19  to the jury instruction, if there are still remaining reasonable

20  doubts, it is your duty to find that person not guilty.

21      So we now know about the beyond-a-reasonable-doubt standard,

22  the burden of proof, how high this standard really is.

23      You have also heard a little bit about the government's case.

24  The government's case is that Ellen was -- or Ellen participated

25  in this because she was there on a cold night in November wearing

 1   dark-colored winter coats and hats and facial coverings and that

 2   she had a bag and in that bag was the drill and a wire.  And

 3   let's break down those pieces for just a moment.

 4       The government has to prove not just that Ellen was there,

 5   right?  I think the mere presence -- the mere presence portion of

 6   the jury instructions talk about that.  But she has to be a

 7   participant in the placement of this wire, that she has to

 8   knowingly impair the operation of the railroad signal system,

 9   meaning if it's the wire that impaired the railroad signal

10   system, then the government has to prove that she participated in

11   the placement of that wire.  And there's no evidence of her

12   participating in the placement of that wire.

13       Now, you heard testimony about how, in 2020, there were these

14   shunting incidents, and, in particular, there was this incident

15   in October.  Of course, there was no testimony or evidence that

16   Ellen was involved in any of that.  You heard from Eric

17   Shaffstall, who told you he was a BNSF employee, a Burlington

18   Northern Santa Fe Rail employee, as was Deputy Chief Nies.  And

19   that, according to Shaffstall, his job was to sort of, he called

20   it a -- or his previous job, before he became a supervisor, he

21   called himself a pencil planner of this system and his job was to

22   ensure the efficiency of this railroad system of the business,

23   and that, from his perspective, these shunting incidents were

24   disrupting that system.  Now, this was a problem, and so, Nies,

25   he told you that they had these cameras placed.  You also heard

1   from Deputy Chambers, who talked about the area of the incident

2   in specific on November 28th, and we will get back to that in a

3   moment.

4        But the thing about these cameras, as Nies told you, these

5   are game cameras, they're primarily used for hunting, which is

6   why they had the temperature indicator or marker at the bottom of

7   the cameras.  They're motion-activated, which makes sense.  If

8   you are a hunter, you want to know where in general the game is

9   located.  So he had these cameras placed.  And he told us that

10  the cameras work by when there's motion; when the camera is

11  triggered by motion, it takes bursts of photos, meaning a series

12  of photos, to capture whatever it is that triggered the motion of

13  the camera or in front of the camera.  Nies also told you that

14  this camera was placed at about the site the shunt was placed,

15  was later found, and so we saw this photo.

16       Now, the government, they want you to believe that this is

17  evidence of Ellen placing or participating in the placement of

18  this device, but the funny thing about this photo, when you look

19  at it, you see one, maybe two people, walking down the tracks.

20  What you don't see are people kneeling or placing anything on the

21  tracks.  You don't see the use of machinery, like a drill

22  perhaps.  I mean, remember, this is a motion-activated camera and

23  it collects evidence in bursts or photos in bursts, right?  And

24  so if Nies is telling you that this camera is focused right at

25  the location where the shunt or the wire was found and it is

 1   motion-activated, what better evidence could we have than to have

 2   photos of someone placing the wire, the device?  But we just

 3   don't have that.  We have a photo of one, maybe two people,

 4   walking.

 5       Now, the government didn't present any other evidence either,

 6   right?  You couldn't say, "Well, Chris, you know, this is a burst

 7   of photos, meaning a series.  Perhaps this is Photo No. 3, but

 8   it's Photo No. 40 that shows, you know, the placement of the

 9   wire."  But the government didn't produce that either, and you

10   have to wonder why.  If this is a motion-activated camera, Nies

11   tells you, the Deputy Chief of Police of the railroad, it is

12   faced directly at the portion of rail where this shunt was found,

13   then it should have collected a photo of the placement of that

14   wire.

15       You also heard from the responding officers, the people who

16   were actually there responding to the scene after this photo

17   notified Nies and Nies called the Whatcom County Sheriff's

18   Department, and they said they could hear Ellen and her companion

19   talking, but they didn't hear any drills or any other noise; they

20   didn't see perhaps sparks flying from the use of the drill on the

21   rail.  There was no testimony of any of that.

22       The government also relies on this bag, the presence of the

23   bag, that Ellen was holding a bag.  Now, the government offered

24   that this bag is kind of like the smoking gun, but the problem

25   with that analogy is that there's no evidence here that Ellen was

1    using the items in the bag to place the wire in order to

2    knowingly impair the railroad signal system.  It would have been

3    easy to do, perhaps.  You heard testimony about how the Sheriff's

4    Department turned over the contents of the bag to the FBI.  The

5    FBI could have tested the drill, perhaps, for fingerprint

6    analysis.  I mean, in theory, fingerprints could be on the drill,

7    right?  Or if we were to go with the government's suggestion that

8    maybe the gloves were used in order to hide fingerprint analysis,

9    then why not test the gloves?  You know, we're talking about

10   testing the gloves, but the government didn't do that.  Wouldn't

11   there be DNA on the interior of the gloves if someone was using

12   these gloves to work, to place a wire on a railroad?  No evidence

13   of that was produced or presented.

14       We heard testimony about the light source.  We heard a lot

15   about this light.  And you heard Deputy Chambers, the first

16   officer on the scene, the first person to see Ellen and Ellen's

17   companion, and Chambers testified that he turned his car -- the

18   floodlight from his car on the railroad and he moved his body up

19   the railroad, and at some point, when he was looking for this

20   wire, he used his flashlight.  Now, the government says, you

21   know, that Ellen and Ellen's companion's story doesn't make sense

22   because they said they were looking for keys and they didn't have

23   a source of light to look for the keys.  Well, Chambers needed

24   light to find the wire, right?  He testified about that.  And you

25   saw his flashlight in one of those photos.  And if Chambers

 1  needed a flashlight in order to find the wire, couldn't it stand

 2  to reason that perhaps whoever placed the wire, if it were placed

 3  in the dark around midnight, that they too would need some sort

 4  of source of light?  But the government's witnesses told you

 5  Ellen did not have any source of light.  No cell phone, no

 6  flashlight, no headlamp, nothing.

 7       Now, the government also wants you to rely on Ellen's

 8  clothing, that Ellen was wearing all black, a black winter

 9  coat -- it was winter, it was close to freezing -- a hat, a

10  beanie, a facial covering, and that that is evidence that Ellen

11  participated in the placement of this wire which impaired the

12  railroad signal operation system.  Or if you combine the clothing

13  with the story, the government said that Ellen and Ellen's

14  companion told a story -- I believe the government characterized

15  it as a lie -- about the contents of the bag.  If you combine

16  those things, then that's proof beyond a reasonable doubt.  The

17  thing, though, about that is that although the government

18  characterized this story as a lie, that's not what Chambers, Dane

19  Chambers said, the responding officer.  He said that they were

20  lighthearted jokes, which makes some sense, right?  I mean, if

21  one is trespassing on a railroad in an area where you are not

22  supposed to be, might it make sense, then, that you maybe make a

23  joke to lighten the mood?  I mean, that's how the officer

24  characterized what was said.

25       And, finally, the government offers the fact that this wire

1  caused the signal -- or the circuit block to appear as occupied,

2  and that is evidence that the wire impaired the railroad signal

3  system.  But you heard from Deputy Chief Nies, who was monitoring

4  this system, that that only occurred for a moment, a minute.

5  That might otherwise be described as a blip, sort of like a

6  flickering of the lights perhaps, and that can hardly be said to

7  impair the operation of the railroad signal system.  Actually,

8  Shaffstall even told you something further, and that's that, you

9  know, it could have impaired the railroad signal system.  But

10  Shaffstall wasn't there, he didn't measure the distance between

11  this wire shunting device and the signal, the crossing arms at

12  Cliffside Drive.  He previously said that distance matters,

13  right?  Because if it's outside of range, then it won't impair

14  that crossing arm.  But, really, what we have is a momentary blip

15  of the circuit block appearing as occupied and then going back to

16  unoccupied, and no evidence that the crossing arm was actually

17  impaired.

18      The government didn't present any evidence that the wire was

19  actually affixed to the rails.  You heard testimony about these

20  circular magnets and how, in the other shunting incidents, there

21  were circular magnets found.  But none were found here.  You

22  heard testimony from Chambers who said that although there was

23  tape in the bag, there was no tape on the rails that he could see

24  or affixed to the wire.  The government has to prove beyond a

25  reasonable doubt that this wire impaired the railroad

1    operating -- I'm sorry, impaired the railroad signal system.

2         You heard testimony about how other things could also cause

3    disruptions for the railroad signal system, meaning there are

4    many things that could cause the signal blocks to appear as

5    occupied and then go back to unoccupied.  And Shaffstall told you

6    that there's no way of knowing what might cause something to turn

7    as occupied and unoccupied without actually going to visit and

8    test.  He did say that you could tell if it's a train because you

9    would be tracking the train along through the circuit blocks, but

10   beyond that, if something just appears as occupied on that

11   particular circuit block, that there is no way of knowing what

12   caused that.  We heard testimony about slumps or about power

13   source failures or about problems with the relays.  Here is the

14   thing, the government simply wants you to put these things

15   together and argues that that's proof beyond a reasonable doubt.

16   But it's not.

17        Now, there are also some greater context kind of things that

18   we learned in this trial that are important too.  We learned that

19   this photo was not just a photo of the railroad kind of in a

20   deserted, isolated area, but that this was a section of rail that

21   was in a residential area with a park.  That there was a problem

22   with trespassing.  We heard that too.  We also had this video.

23   You can go ahead and play it.  But this is what the area actually

24   looks like.  This is the park, Marine Drive Park.  This is the

25   crossing, Cliffside Drive crossing.  This is what the area

1  actually looks like.  It's a park.  It's where people come to

2  gather, play with their dogs, picnics, barbecues, gather with

3  family members.  In a pandemic, see friends.  It's outside.  It's

4  a park.  It's easily accessible.  Now, that puts a much different

5  perspective on this photo, doesn't it?  I mean, this is a photo

6  of in the dark.  But, really, this is what we're talking about.

7  That gives the photo a different meaning.

8      Now, there's also a greater context of the bag, and we urge

9  you not to just look at this bag in a vacuum.  The government

10  wants you to think Ellen was holding the bag so that must mean

11  Ellen participated in the placement of the wire.  And what's not

12  to say, though, in theory, that the bag wasn't just found by

13  Ellen on a stretch of rail?  I mean, this is a park, it's an

14  easily accessible area, there's a railroad running through this

15  area, there's a problem with trespassing in the area, there's a

16  problem with shunts as well.  Nies and the BNSF Railroad

17  operators, they place a game camera, or cameras, throughout their

18  system to try to figure out who is walking on their rails and

19  perhaps who's placing shunts.  Someone comes along -- again, an

20  easily accessible rail -- they try to place a shunt, they don't

21  have the round magnets, they leave the bag to go get magnets,

22  along comes Ellen and a companion taking a walk.

23      The government has to prove that Ellen participated in the

24  placement of the wire and that she knowingly impaired the

25  operation of the railroad signal system.  The government has to

1    prove that she was involved -- involved -- and they have to do it

2    beyond a reasonable doubt, meaning they have to meet that high

3    burden of proof such that you have no reasonable doubt about

4    Ellen's involvement.

5        Finally, the government wants you to evaluate Ellen's

6    statements, and we talked a little bit about this already, but

7    Chambers described these statements as jokes, lighthearted jokes.

8    And we have some direction from the Court on statements, and

9    that's Jury Instruction, I'm not sure it's actually 27, but it

10   says "You have heard testimony that the defendant made a

11   statement.  It is for you to decide whether the defendant made

12   that statement" -- and that's not really in dispute here -- but

13   the second part is, "... and, two, if so, how much weight to give

14   to it.  In making those decisions, you should consider all the

15   evidence about the statement, including the circumstances under

16   which the defendant may have made it."

17       So, again, I mentioned this earlier, but isn't it conceivable

18   that Ellen is walking through a park with a friend, and the

19   friend decides to walk down the tracks, they know that it's

20   trespassing, suddenly they're confronted by officers, and they

21   make this joke about the bag that they found?  The jury

22   instructions say that you can consider the circumstances under

23   which the defendant may have made the statement.

24       The thing is, the government did not prove its case beyond a

25   reasonable doubt.  It did not prove that Ellen knowingly impaired

1   the operation of the railroad signal system through the placement

2   of the wire, that Ellen participated in that event.

3       The government did not prove that the wire disrupted the

4   railroad system or signal system either.  The government has to

5   prove that the wire actually impaired the operation of the

6   railroad system, not that it could have or that it might have or

7   that, in theory, if the right things happened, it could have.

8   That it impaired the railroad signal system.  The government has

9   not proved that either.

10      When you come back to our chart and examine the evidence

11  presented with that careful and impartial consideration of the

12  evidence and the lack of evidence and hold the government to its

13  burden, we ask that you find that Ellen is not guilty of this

14  offense.  Ellen may have trespassed; Ellen is not guilty, though,

15  of violence against railroad carriers.

16      Thank you.

17          THE COURT:  And thank you, counsel.

18      Ladies and gentlemen, because the government does have the

19  burden of proof, they have the final ability to present a short

20  rebuttal.

21      Please now give your kind attention to Mr. Kopczynski for

22  that rebuttal.

23          MR. KOPCZYNSKI:  Thanks, Your Honor.

24      Okay.  Ladies and gentlemen, the defendant does not dispute

25  that she is caught that night in November holding this drill

1   that's in the bag, the brush bit, the gloves, extra wire.  And

2   then what is it that was found right there on the tracks where

3   the defendant and her co-conspirator were?  Another wire.

4       Let's stay focused on some of these core facts.  As my

5   colleague, Ms. Jiang, said, this is a simple case, and nothing

6   Mr. Sanders said changes that.

7       I have an opportunity now to walk through some of those core

8   facts and respond to some of the defense arguments.  So, first,

9   let's stay focused on this bag and what's inside of it.  Now, we

10  heard a couple of different theories.  One thing we heard is,

11  well, maybe she found that bag, maybe it was just sitting out

12  there on the tracks, and whoever else had put the shunt, forgot

13  it, she picked it up.  We will come back to that in a minute.

14  That's one theory.  It's just found out there.

15      You also heard, well, the bag could have been tested for DNA

16  or fingerprints or maybe some other fancy things we have seen on

17  TV, hear about in podcasts, or things like that.  Well, that's

18  true, but do you really need fingerprints or DNA when she is

19  literally holding the bag?  What fingerprints do is tell you if

20  someone has touched something.  This defendant was holding the

21  bag.  There's no dispute.  She's touching it.  She's holding it.

22  And if you start playing out that way of thinking, you can

23  imagine all sorts of evidence you didn't hear in this short

24  trial.

25      Now, the defense mentioned some.  I will give you a couple

1    more.  The defense said, well, so that camera that Deputy Nies

2    placed, well, the camera didn't actually catch them in the act,

3    those pictures are about 20 minutes earlier.  Now, the defense

4    said those cameras were pointed right at where this shunt was.

5    Your memory of the testimony controls.  I submit that the

6    testimony was the camera was actually pointed in the area but a

7    little bit different.  And that actually explains why the

8    deputies, when they first show up, they split up.  Deputy

9    Streubel ends up at the wrong intersection.  He has to come

10   around.  The cameras, I submit the testimony was, were not

11   pointed at the exact spot.  But here is even the bigger point

12   about that:  Sure, the cameras could have been video cameras.

13   They capture still images, but maybe you would have video

14   cameras.  We heard this idea of maybe Deputy Chambers would have

15   been closer and he would have heard the drill sounds.  Anybody

16   ever run a cordless drill?  It will make a sound.  You can hear

17   it.  Maybe he would have seen sparks flying if he had been close

18   enough.  It's dark.  Maybe someone would have been hiding in the

19   bushes filming the whole thing on their cell phone and they

20   posted it to Twitter.  You can spin out a lot of evidence that

21   you didn't hear.  I submit to you that that's not a very helpful

22   way to think about the evidence in this case.  I suggest to you

23   that what you can do is think about the evidence you did hear.

24       So let's get back to some of the evidence that you actually

25   did hear.  So about this bag, could it have just been found by

1  her on the tracks?  Well, if it was, it's awfully strange that

2  she lied about it.  She was asked what was in there, and she lied

3  about it, says this thing about Thanksgiving dinner.  Now, the

4  defense says, well, the lies could have been jokes.  Okay.  It's

5  not a very funny joke, but it could be a joke, I guess.  All of

6  it could be jokes.  Also, the whole thing about the keys, I

7  guess.  That was another lie.  It could have been a joke.

8      So, then, what about the fact that at that exact spot where

9  they're on the rails and Deputy Chambers sees them, he later goes

10  back out, the frost is disturbed, and he goes right there and he

11  finds the wire?  You see, you think about these things together.

12  Mr. Sanders talked about breaking down the evidence.  I would

13  encourage you to think about it as a whole.

14      If you remember, the judge, at the outset of the case, had a

15  great discussion about circumstantial and direct evidence.  I

16  want to sort of riff on that a little bit, if I may.  If you are

17  trying to decide if it's raining outside, as the judge said, you

18  know, maybe you see somebody walking and they're carrying an

19  umbrella.  Now, that single piece of evidence in isolation, you

20  say to yourself, "Well, gee, you know, sometimes I bring my

21  umbrella and then it turns out it doesn't rain, so I didn't need

22  it, and I carried it the whole lunch hour."  So maybe if you just

23  got someone you saw carrying an umbrella, you can say, "Okay,

24  there's possibly an explanation," just like maybe if you had all

25  of those lies, well, maybe those are jokes.  But then if you keep

1   stacking evidence on top of evidence.  So, in my rain example,

2   you look at the window and there's water on the window, well,

3   maybe someone is out, you know, tending the lawn and they

4   accidentally sprayed the window with the hose, okay?  But then

5   maybe you see somebody walk in and they have their raincoat on

6   and they're dripping wet and then maybe you actually hear rain,

7   it's a metal-roofed building you are in and you hear rain hitting

8   the roof, maybe you think you hear some thunder or see lightning.

9   At some point you think about the evidence as a whole instead of

10   in isolation and at some point you are pretty darn sure it's

11   raining.

12       So, here again, you think about this sequence of events.

13   Think about the bag and then the lies about the bag and then the

14   discovery of the shunt right there where they were standing, with

15   freshly disturbed ground and the dirt on the defendant's knees,

16   you start to think about that all together, and either the

17   defendant is the unluckiest person in the world or she's guilty.

18       So a couple of other things we heard from Mr. Sanders, I will

19   briefly respond to.  First of all, this notion of mere presence.

20   In fact, it reinforces exactly what I just said.  The judge read

21   to you an instruction on this and talked about the fact that if

22   the defendant was just there doing nothing else, but just merely

23   present at the scene of a crime, she's not guilty.  And the

24   instruction says the defendant's presence may be considered by

25   the jury, along with other evidence in the case.  And so, again,

1   take her presence and put it in that big picture of the lies, of

2   the shunt found right where they are, the clothing.  That's

3   another one, right?  A heavy winter coat.  Well, it's cold out.

4   Okay.  If it was just the heavy, dark, black clothing head to

5   toe, the black boots -- you saw the photographs -- the hat, the

6   mask.  I mean, it's COVID.  Maybe the mask by itself doesn't mean

7   much.  If you break it down and separate it, maybe each of those

8   pieces has some explanation.  You put it all together.  As the

9   instruction says, consider these things in conjunction with the

10  other things.

11      A couple of other things.  Remember, as Ms. Jiang said, I'm

12  not the source of the law.  Mr. Sanders, none of the attorneys,

13  are the source of the law.  The judge gives you the law.  I

14  submit to you that what the judge said and instructed you on just

15  earlier this afternoon is in fact it doesn't matter who

16  physically got down and attached the wire to each rail.  It

17  doesn't matter.  In legal jargon, this is the concept of aiding

18  and abetting.  It's Instruction 14.  I will read from it.  "The

19  government is not required to prove precisely which defendant

20  actually committed the crime and which defendant aided and

21  abetted."

22      In this situation, it doesn't matter if Brooks or the

23  defendant, who did which side -- maybe one of them put it on one

24  side and one on the other, it doesn't matter -- she is guilty.

25      And, similarly, this whole idea about did the wire work.  Now

1    that gets into another piece of evidence that the defense has

2    spent a lot of time in this trial trying to explain away.  So if

3    you remember, we had the exhibit, when Deputy Chief Nies was on

4    the stand, that showed that system that says when a train block

5    is occupied.  So there's that little red line.  Remember that?

6    And so Deputy Chief Nies testified that that occurred a little

7    after 11:40, just right around the time, it so happens, that

8    Deputy Chambers saw the defendant and Brooks out there kneeled

9    down over the tracks.  And at that same time, sure enough, it

10   pops up on the screen.

11        Now, the defense, as I say, you know, they've made a lot of

12   effort in this case to try to explain away that piece of

13   evidence -- never mind all the other evidence -- but even just on

14   that one little piece.  Maybe that was a landslide.  That video

15   we just watched seemed to show it's pretty flat ground.  But

16   maybe it's a landslide or there's a power-outage defense, right,

17   or the power-disruption defense.  I think -- and, again, your

18   memory of testimony controls -- Mr. Shaffstall, from BNSF, talked

19   about this very issue when crossed by Mr. Sanders.  And there was

20   that moment in the cross-examination where Mr. Shaffstall said,

21   "Well, actually, our systems are more sophisticated."  And he

22   explained the radio connection and that, in fact, dispatch would

23   be aware of some of these problems, these sort of phantom

24   problems that might have explained that red bar on the screen,

25   like the power outage.  Mr. Shaffstall shot all of that down.

1    But you know what?  Even if he didn't, two things.  Again, that

2    is one piece of evidence, the fact that that red-block-occupied

3    signal lights up at the moment that Deputy Chambers sees the

4    defendant out on the tracks.  That's one piece of evidence.

5    There's lots of other evidence.

6        And, moreover, the second thing, the law is clear, as given

7    to you by the judge, that whether that shunt actually worked,

8    whether they succeeded or were interrupted before they could

9    finish the job, doesn't matter.

10        We have talked in this trial about some of the consequences,

11   how the signalling system works, what happens to cars crossing

12   over the railroads.  We talked about those things.

13   Mr. Shaffstall explained -- Deputy Nies too -- the important

14   consequences of their work and the risks inherent in moving these

15   big, heavy trains over rails through residential neighborhoods.

16        So, yeah, we have talked about that.  But whether this shunt

17   worked doesn't matter because the defendant, even if you decide

18   that that momentary blip on the screen, the red indication, isn't

19   the completed crime -- and we submit to you that it is, that's

20   the crime -- even if you decided, you know what, no, she didn't

21   complete the crime, well, then she attempted and conspired to do

22   so.  And you are instructed on that.  An attempt is just that,

23   what it sounds like.  There's no legal secrets involved.  It's an

24   attempt to do a crime that you don't finish.

25        So the defendant and Brooks went out there, they put that

1    wire on the tracks.  It doesn't matter if they successfully, that

2    night, impaired the signalling system.  You can find them guilty

3    of conspiring and attempting do so.

4         So I will sum up.  As you return to your -- well, your

5    deliberation room, not where it ordinarily would be, but as you

6    return to deliberate, please think carefully about the law, about

7    the evidence.  If you would like to, have a look at this stuff.

8    Review the photographs, study it carefully.  You're entitled to

9    look at and study all of the evidence.  And I encourage you to

10   think about all of it.  Don't get distracted, use your common

11   sense, think about the whole body of evidence you have heard in

12   this trial, and I submit that there really is only one possible

13   conclusion, which is the defendant is guilty.

14              THE COURT:  Thank you, counsel.

15        All right.  There's thirteen of you here.  Only twelve are

16   allowed to deliberate.  So Madam Clerk is going to randomly

17   select one of you to be the alternate.  And what does that mean?

18   That means that you are still basically having to abide by the

19   existing conditions.  You cannot talk about the case.  If, for

20   example, something were to happen when the jury is deliberating

21   and we needed to start those deliberations over because someone

22   is absent, then the alternate juror would come back in to do

23   that.

24        Madam Clerk.

25        All right.  As it turns out, Juror No. 13 is the alternate

1    juror.  Lucky No. 13.  There really were thirteen numbers in

2    there, all right?  I looked earlier.

3         All right.  So, again, you are still under the prohibition

4    that the Court has given you earlier about not being able to

5    communicate with anyone.  Please leave a number where we can

6    reach you at quickly.  If the jury should reach a verdict or be

7    discharged, we will communicate that with you immediately and let

8    you know.

9         All right.  So if you have anything in that room over there,

10   then if you would go back, before they begin, just go ahead and

11   grab all your stuff, and then you are free to go at that point in

12   time.

13        For the rest of you, you are only allowed to deliberate when

14   only the twelve of you are present.  Nobody else should be in

15   there except someone from my chambers or my staff.  Before they

16   come in, they will announce themselves and let you know that

17   they're coming in, all right?

18        All of the exhibits that were admitted will be taken into

19   that other courtroom, instead of our deliberation room, by our

20   clerk, and, as counsel indicated, you are free to look at any of

21   those items to your heart's content.

22        All right.  Let me have you then retire to Judge Jones'

23   courtroom that we are using for the deliberation room.

24        (The following occurred outside the presence of the jury.)

25             THE COURT:  Counsel, it's in the jury's hands now.  I

1    want to thank all of you.  It's about 2:40 or so.  I intend to

2    let them go at the regular time, at 4:30.  What will happen is my

3    clerk will knock on the door about five minutes before 4:30 and

4    indicate that we are letting them go.  We will notify you if that

5    occurs.  They will come back and start tomorrow again at 9

6    o'clock in the morning.  If for whatever reason they reach a

7    verdict, please be within ten minutes of the courtroom so we can

8    get everybody back here.  So, Ms. Reiche, that applies to you as

9    well.

10        And, obviously, if they send out a question, we will

11   communicate by phone.  There's no need to bring you back here

12   unless we need to do something on the record.

13        All right.  Thank you all very much.  We will be at recess.

14                         (Adjourned.)

15

16              C E R T I F I C A T E

17

18        I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

19   United States District Court in the Western District of

20   Washington at Seattle, do certify that the foregoing is a correct

21   transcript, to the best of my ability, from the record of

22   proceedings in the above-entitled matter.

23

24                    /s/ Nickoline Drury

25                    Nickoline Drury